J-A15043-16

2016 PA Super 251

ROSALIND W. SUTCH, AS EXECUTRIX OF
THE ESTATE OF ROSALIND WILSON,
DECEASED

IN THE SUPERIOR COURT OF
PENNSYLVANIA

v.

ROXBOROUGH MEMORIAL HOSPITAL,
SOLIS HEALTHCARE, LP, ANDORRA
RADIOLOGY ASSOC., TENET
HEALTHSYSTEM ROXBOROUGH, LLC,
TENET, INC., TENET GROUP, LLC,
ROXBOROUGH EMERGENCY PHYSICIAN
ASSOCIATES, LLC, BARBARA ROBINS,
M.D., JEFFREY GELLER, M.D., AND
MELANIO D. AGUIRRE

APPEAL OF: NANCY K. RAYNOR,
ESQUIRE

No. 1836 EDA 2015

Appeal from the Judgment Entered May 2, 2012
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 0907-0901

ROSALIND W. SUTCH, AS EXECUTRIX OF
THE ESTATE OF ROSALIND WILSON,
DECEASED

IN THE SUPERIOR COURT OF
PENNSYLVANIA

v.

ROXBOROUGH MEMORIAL HOSPITAL,
SOLIS HEALTHCARE, LP, ANDORRA
RADIOLOGY ASSOC., TENET
HEALTHSYSTEM ROXBOROUGH, LLC,
TENET, INC., TENET GROUP, LLC,
ROXBOROUGH EMERGENCY PHYSICIAN
ASSOCIATES, LLC, BARBARA ROBINS,

M.D., JEFFREY GELLER, M.D., AND
MELANIO D. AGUIRRE, M.D.

APPEAL OF: JEFFREY GELLER, M.D. AND
ROXBOROUGH EMERGENCY PHYSICIAN
ASSOCIATES, LLC

No. 1852 EDA 2015

Appeal from the Judgment Entered May 15, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 0907-0901

BEFORE:  FORD ELLIOTT, P.J.E., DUBOW, J., and JENKINS, J.

OPINION BY JENKINS, J.:                **FILED NOVEMBER 15, 2016**

In this contentious medical malpractice action, Jeffrey Geller, M.D. ("Dr. Geller") and Roxborough Emergency Physician Associates, LLC ("REPA") appeal at 1852 EDA 2015 from a judgment of $778,643.85 entered in favor of Rosalind Sutch, personal representative of the Estate of Rosalind Wilson, deceased ("the Estate").[1]  Dr. Geller and REPA argue, among other things, that the trial court abused its discretion by disqualifying their attorney, Nancy Raynor, Esquire, from representing them during the second trial in this case.

Raynor herself appeals at 1836 EDA 2015 from an order directing her to pay $44,693.25 in counsel fees to the Estate.

_____

[1] There were two trials in this case.  Following the first trial, the trial court granted the Estate's motion for new trial, and this Court affirmed.  The second trial resulted in a verdict for the Estate, which the trial court subsequently reduced to judgment.  The appeal at 1852 EDA 2015 followed.

- 2 -

On August 17, 2015, we consolidated these appeals *sua sponte*. For the reasons that follow, we affirm.

**Factual and Procedural History**

**Decedent's illness and lawsuit.** On May 3, 2007, Rosalind Wilson ("Decedent"), then 68 years old, visited the emergency room of Roxborough Memorial Hospital ("Hospital") due to a headache, chest pains and shortness of breath. Jeffrey Geller, M.D. ("Dr. Geller") saw Decedent and ordered a chest x-ray. A radiologist, Barbara Robins, M.D., reviewed the x-ray and noted a suspicious 2.3 centimeter nodule on both a hospital STAT sheet and in her preliminary and final reports. Dr. Robins also recommended a CT scan.

During Decedent's overnight stay, Hospital physicians ruled out cardiac problems and pulmonary embolism. But at discharge, neither Dr. Geller nor the attending physicians, including Melanio Aguirre, M.D., advised Decedent of her lung nodule or her need for a CT scan.

Twenty months later, in January 2009, Decedent learned that she had Stage IV lung cancer. The malignant lung nodule had grown to 8 centimeters and metastasized to her brain. In early July 2009, Decedent filed a writ of summons against Hospital, Dr. Geller, REPA and other defendants. On July 21, 2009, Decedent passed away. After her death, her personal representative ("the Estate") filed a complaint alleging that all

defendants breached their duty to tell Decedent about her lung nodule during her hospitalization in May 2007.

**Raynor's and Packett's letters to HUP.** On July 21, 2009, attorney Raynor of the law firm of Raynor & Associates ("the Raynor firm") entered her appearance for Dr. Geller and REPA in the medical malpractice action. Trial was originally scheduled for December 6, 2011, but another defendant, Dr. Aguirre, had a medical emergency which necessitated a continuance until May 21, 2012.

On January 13, 2012, four months before the new trial date, Raynor sent a letter to general counsel for HUP, a non-party in the medical malpractice action. Raynor's letter attacked the anticipated testimony of the Estate's expert witness on emergency medicine, Stefanie Porges, M.D., whom HUP employed as an emergency room physician. Raynor labeled Dr. Porges' opinion "untenable" and wrote: "I thought you might want to know that, if this is [Dr. Porges'] position and plaintiff[s'] attorneys become aware of it, it could expose [HUP] to significant liability … I find it very difficult to believe that [Dr. Porges' opinion] could be the official position of [HUP] under these circumstances …"

The head of HUP's Emergency Department contacted Dr. Porges about Raynor's letter, and Dr. Porges in turn notified the Estate's attorney. The Estate filed a motion seeking monetary sanctions and Raynor's disqualification from representing Dr. Geller and REPA. Undaunted, Raynor

had an associate in her law firm, Judy May Packett, send letters to the Estate's attorney in March and April of 2012 inquiring whether Dr. Porges would remain as the Estate's expert.

On April 19, 2012, Raynor and Packett attended a hearing before the Honorable Jacqueline Allen concerning the Estate's motion for sanctions. Raynor stated that she "simply just said to someone outside the course of what [Dr. Porges] did in this case that hey, this is an opinion that's out there." N.T., 4/19/12, at 47. Raynor contended that her letter to HUP "is the type of thing that happens all the time. It could have been information relayed at lunch or at a cocktail party." *Id*. at 18.

On April 30, 2012, Judge Allen granted the Estate's motion in part and ordered Raynor to refrain from contacting the Estate's expert witnesses and/or their employers about any matter relating to the Estate's case. Judge Allen determined that another hearing was necessary to determine the proper sanction but stayed the hearing pending the disposition of the upcoming trial.

**First trial.** Prior to trial, the Honorable Paul Panepinto, the assigned trial judge, granted the Estate's motion *in limine* to preclude all references to Decedent's long history of smoking.

During trial, Dr. Porges testified for the Estate as an expert witness on emergency room medicine. Raynor called John Kelly, D.O., as a defense expert on the same subject. During direct examination, Raynor asked Dr.

Kelly whether Decedent had any cardiac risk factors. Dr. Kelly responded that Decedent was a smoker and was hypertensive. At the conclusion of Dr. Kelly's testimony, the Estate's attorney requested a sidebar conference. Judge Panepinto dismissed the jury and asked Dr. Kelly whether Raynor made him aware of the order banning all mention of Decedent's smoking. Dr. Kelly answered that he did not remember discussing the order with Raynor.

The next day, the Estate moved for a mistrial. Judge Panepinto denied the motion but gave a curative instruction to the jury. Several days later, on June 8, 2012, the jury returned a verdict for the Estate in the amount of $190,000 against Roxborough Memorial Hospital and Dr. Aguirre, but not against Raynor's clients, Dr. Geller and REPA. The Estate filed post-trial motions requesting a new trial on the ground that the court erroneously denied its motion for mistrial.

**Further sanctions proceedings before Judge Allen.** While post-trial motions were pending before Judge Panepinto, the Estate filed a supplemental memorandum with Judge Allen in support of its motion for sanctions against Raynor. The supplemental memorandum contended that the Estate incurred $45,694.25 in fees due to the hearings and motions necessitated by Raynor's letter to HUP. The Estate also claimed in the supplemental memorandum that Raynor committed misconduct during the "smoking" incident in the first trial.

Judge Allen held a sanctions hearing, and on August 28, 2012, she entered an order (1) directing Raynor to pay $44,693.25 in counsel fees to the Estate and (2) disqualifying Raynor -- but not other attorneys in the Raynor firm -- from further representation of Dr. Geller and REPA.

Raynor filed an interlocutory appeal from Judge Allen's sanctions order, which this Court quashed.

**New trial granted and interlocutory appeal.** On October 22, 2012, Judge Panepinto granted the Estate's motion for a new trial. All defendants appealed at 3246, 3249, 3255 & 3257 EDA 2012 (including Dr. Geller and REPA at 3246 EDA 2012).[2] On November 4, 2013, this Court affirmed, stating that "the trial court properly reasoned [that the Estate] would suffer unfair prejudice if the jury discovered that [Decedent] was a smoker for approximately 50 years, in that this information might lead the jury to hold [D]ecedent accountable, to some extent, for contributing to the cause of her death, i.e., lung cancer." **Sutch v. Geller, et al.**, 3246 EDA 2012 et al., at 15-16 (Pa.Super., 11/4/13). None of the parties filed a petition for allowance of appeal with our Supreme Court.[3]

---

[2] Dr. Geller and REPA state incorrectly that the "*Plaintiff*" appealed. Brief For Dr. Geller and REPA, at 50 (italics and underlining in brief).

[3] In separate proceedings, Judge Panepinto held both Raynor and the Raynor firm in civil contempt and imposed monetary sanctions in the amount of $946,197.16 on the ground that Raynor's conduct in the "smoking" incident forced the court to order a new trial and caused needless expense to the

*(Footnote Continued Next Page)*

**Proceedings before second trial**. Although Raynor herself was disqualified as counsel, two attorneys from the Raynor firm, Packett and Carolyn Sollecito, continued to represent Dr. Geller and REPA. Sollecito drafted all memoranda relating to the second trial, and she continues to represent Dr. Geller and REPA in this appeal. Packett served as trial counsel for Dr. Geller and REPA during the second trial.

The Honorable Frederica Massiah-Jackson presided over the second trial. The parties filed multiple pretrial motions *in limine*, including the Estate's Motion *In Limine* To Enforce Pennsylvania Superior Court Order As The Law Of The Case And To Preclude Any Reference to Decedent's Smoking. On October 17, 2014, Judge Massiah-Jackson granted this motion in part and denied it in part, ordering that the parties could not use Decedent's smoking history with regard to causation but could use it with regard to damages. The judge also held that the Superior Court opinion at 3246 EDA 2012 was "the law of the case."

**Second trial.** The second trial began on October 21, 2014. Thus, Sollecito and Packett had over two years following Raynor's disqualification to prepare for trial and/or to obtain new counsel for Dr. Geller and REPA.

*(Footnote Continued)* _____

Estate. Raynor and the Raynor firm appealed to this Court at 3494 EDA 2014. In a published opinion issued on June 15, 2016, this Court reversed the contempt order and vacated the judgment entered on the monetary sanctions. *Sutch v. Roxborough Hospital*, 142 A.3d 38 (Pa.Super.2016). On July 15, 2016, the Estate filed a petition for allowance of appeal to our Supreme Court at 313 EAL 2016. This petition remains pending.

Dr. Geller's defense was that he never received Dr. Robins' radiology report about the nodule in Decedent's lungs. In rebuttal, the Estate presented the testimony of Dr. Porges, the same expert on emergency room procedure that the Estate had presented during the first trial. Dr. Porges observed that Dr. Geller ordered the chest x-ray which led to Dr. Robins' report identifying the lung nodule and recommending a CT scan. Dr. Porges opined that Dr. Geller breached his duty as the ordering doctor to obtain the test results. Dr. Porges testified that if Dr. Geller did not intend to obtain the test results, he had a duty to write in Decedent's chart that the test results were not obtained, and that he expected someone else to obtain them. Relying on Dr. Robins' testimony, Dr. Porges stated that Dr. Geller could have obtained the test results either by accessing the Hospital's dictation system, calling radiology or walking 15 feet to the Radiology Department and making a verbal request.

Dr. Robins and Dr. Geller testified that under Hospital's standard practices, the STAT sheet that Dr. Robins prepared, as well as copies of her preliminary and final reports, were supposed to go to Dr. Geller as the ordering physician. The STAT sheet, preliminary report and final report all included Dr. Robins' observation of the lung nodule and her recommendation for a CT scan. Dr. Robins testified that she directed the STAT sheet to Dr. Geller in the emergency room and then completed the preliminary and final reports, each of which identified Dr. Geller as a "cc" recipient.

**Verdict and post-trial proceedings.** On November 4, 2014, the jury found in favor of the Estate and awarded damages of $1,975,713.00. The jury found Hospital 33.4% liable, Dr. Geller 33.3% liable, and Dr. Aguirre 33.3% liable, but it returned a verdict in favor of Dr. Robins. REPA was not on the verdict sheet, but the parties stipulated during trial that Dr. Geller was acting as REPA's agent on May 3, 2007, the date Decedent visited the emergency room.

All parties filed post-trial motions. On May 15, 2015, Judge Massiah-Jackson denied Dr. Geller's and REPA's post-trial motions and entered judgment against Dr. Geller and REPA in the amount of $778,643.85, reflecting 33.3% of the compensatory and delay damages. These appeals followed, and all appellants and the trial court complied with Pa.R.A.P. 1925.

The Estate settled with Dr. Aguirre and Hospital, but Hospital preserved its right in the settlement to pursue damages against Dr. Geller and REPA. The Estate filed a cross-appeal at 2092 EDA 2015 against Dr. Geller and REPA, but it later discontinued the appeal.

### Appeal of Dr. Geller and REPA at 1852 EDA 2015

Dr. Geller and REPA raise the following issues in their appeal, which we have re-ordered for purposes of disposition:

> 1. Should the trial court have entered a judgment notwithstanding the verdict in favor of [Dr.] Geller because [the Estate] failed to prove, by competent and sufficient evidence, her prima facie case of negligence against him?

2. Whether the verdict against [Dr.] Geller was against the weight of the evidence?

3. Whether the trial court committed an abuse of discretion and/or an error of law in precluding testimony as to [Dr.] Geller's decision-making, thought process and standard practice with respect to abnormal lung nodule findings, which was unfairly prejudicial to [Dr.] Geller?

4. Whether improper and prejudicial comments made by hospital counsel during closing arguments could not be cured by any curative instruction?

5. Whether [the Estate's] counsel was given disparate time to question witnesses, leaving Dr. Geller's counsel very limited time within which to present his own testimony and the testimony of key defense witnesses?

6. Whether the trial court erred in denying [Dr. Geller's] motion for post-trial relief insofar as it failed to grant a new trial where [Dr.] Geller was denied his constitutional right to choice of counsel?

7. In the alternative, whether the trial court improperly computed the amount of delay damages in contravention of applicable law?

8. Whether the trial court improperly entered judgment against [REPA] where, among other things: REPA did not appear on the verdict slip; no direct allegations against REPA were made at trial; no finding against REPA was made by the jury; and when liability against REPA was not triggered as a matter of law?

Brief For Dr. Geller and REPA, at 1-2.

Dr. Geller first argues that the trial court improperly denied his post-verdict motion for judgment notwithstanding the verdict ("JNOV"), because he did not receive Dr. Robins' reports about the nodule on Decedent's lung and therefore could not be held liable for failing to act on the reports.

The trial court can enter JNOV on two bases:

(1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the court could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

**Brown v. Trinidad**, 111 A.3d 765, 769–70 (Pa.Super.2015).

Construed in the light most favorable to the Estate, the evidence defeats Dr. Geller's claim of entitlement to JNOV. Dr. Robins, the radiologist, testified that her practice was to review the patient's films; write her findings on a STAT sheet; dictate the findings on the STAT sheet onto the hospital phone system, where any other physician can retrieve it; send the STAT sheet to the ER; and later dictate preliminary and final reports. In this case, Dr. Robins followed these procedures. She wrote her findings on a STAT sheet, phoned a report into the hospital phone system, and drafted a preliminary report and final report. Dr. Geller himself admitted that as ordering physician, he was supposed to receive the STAT sheet and the radiologist's preliminary report. The documentary evidence showed that Dr. Robins "cc'd" Dr. Geller on her preliminary and final reports. The clear

inference arising from this evidence is that Dr. Geller received not one but multiple reports from Dr. Robins.

Dr. Geller attempts to counter these damaging facts by insisting that he received none of Dr. Robins' reports, and that the normal flow of reports simply broke down in Decedent's case. In making this argument, Dr. Geller construes the evidence in the light most favorable to himself, instead of in the light most favorable to the Estate, the proper standard of review. Viewed under the correct standard, the evidence demonstrates that Dr. Geller received Dr. Robins' reports but failed to notify Decedent about the test results, thus allowing the nodule to grow over the next 20 months and cause Decedent's death.

Even assuming that Dr. Geller did not receive the reports, the trial court's denial of JNOV was still proper. Dr. Porges, the Estate's expert, opined that if Dr. Geller did not obtain the test results, he had a duty, as the physician who ordered the tests, to ensure that the next medical provider obtained and reviewed the test results. Dr. Geller breached this duty, said Dr. Porges, by failing to note on Decedent's chart that the results of her tests were "still pending". Thus, assuming Dr. Geller did not receive the report, the jury remained free to credit Dr. Porges' opinion that Dr. Geller was negligent for failing to follow up on the tests he ordered.

Dr. Geller's second argument on appeal is that the trial court improperly denied his post-verdict motion seeking a new trial based on the

weight of the evidence. A weight of the evidence claim is addressed to the discretion of the trial judge. *Armbruster v. Horowitz*, 813 A.2d 698, 702 (Pa.2002). The authority of the trial judge to upset the verdict on weight grounds

> is narrowly circumscribed. A trial judge cannot grant a new trial because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion. Instead, a new trial should be granted only in truly extraordinary circumstances, *i.e.,* when the jury's verdict is *so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.*

*Id*. at 703 (emphasis in original; internal citations omitted).

The trial court acted within its discretion by determining that this case did not present extraordinary circumstances that shocked one's sense of justice. The trial court aptly recognized that this was a "classic battle of conflicting expert opinion." Trial Court Opinion, at 8. The Estate presented ample factual evidence that Dr. Geller received Dr. Robins' reports, ample expert testimony that Dr. Geller's performance fell below the standard of care whether or not he received the reports, and ample expert testimony that his breach of the standard of care caused Decedent's death. The verdict indicates that the jury accepted the Estate's theory of liability and causation. We see no reason to overturn the trial court's decision to deny Dr. Geller a new trial based on the weight of the evidence.

In his third argument on appeal, Dr. Geller contends that the trial court improperly excluded evidence of his experience in dealing with his

father's lung cancer. He claimed that this evidence would have demonstrated that he would not have ignored the test results, because his own life experience sensitized him to lung cancer. He also claimed that this evidence was relevant under Pa.R.E. 406 to show his customary and habitual decisionmaking process in treating patients with Decedent's symptoms.

The admission or exclusion of evidence is a decision subject to the discretion of the trial court, whose decision will not be disturbed absent a clear abuse of that discretion, or an error of law. **Dubose v. Quinlan**, 125 A.3d 1231, 1242-43 (Pa.Super.2015). The trial court properly excluded the proposed evidence as irrelevant and prejudicial.

Evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. Dr. Geller's interaction with his father did not make any consequential fact more or less probable. In no way did this evidence demonstrate whether Dr. Geller actually received Dr. Robins' reports or explain whether he complied with the standards of reasonable medical care that he must meet in his professional capacity.

Dr. Geller contends that the evidence was relevant under Pa.R.E. 406 as evidence of his habits in treating patients with Decedent's symptoms. We disagree. Pa.R.E. 406 provides in relevant part: "Evidence of a person's habit … may be admitted to prove that on a particular occasion the person …

acted in accordance with the habit." Pa.R.E. 406. Habit "connotes one's conduct in a precise factual context, and frequently involves mundane matters (*e.g.*, recording the purpose for checks drawn)." Comment, Pa.R.E. 406. To establish a habit or custom, a party must prove behavior approaching fixed regularity. *See Baldridge v. Matthews*, 106 A.2d 809, 811 (Pa.1956) ("whether evidence of such usage or habit is admissible to show what occurred in a specific instance depends on the invariable regularity of the usage or habit. To be admissible[,] the usage must have sufficient regularity to make it probable that it would be carried out in every instance or in most instances") (internal quotations omitted).

Pennsylvania jurisprudence includes several interesting examples of habit or custom evidence. In *Baldridge*, a hotel clerk testified that it was the hotel's uniform practice to require payment in advance if the guests registered without luggage. The trial court ruled that the testimony was admissible to demonstrate that the defendant and plaintiff's wife had baggage when they registered at the hotel. Our Supreme Court affirmed on the basis that evidence of uniform practice is admissible without specific examples as long as the testimony indicates that the practice was performed with invariable regularity. *Id*., 106 A.2d at 811. Similarly, in *Frey v. Harley Davidson Motor Co.,* 734 A.2d 1 (Pa.Super.1999), a representative of a dealership testified that the dealership had a routine practice of disconnecting the jumper wires on the motorcycles it sold. We affirmed the

trial court's reliance on the witness's testimony to conclude that the dealership was responsible for an inoperable jumper wire that had been cut. *Id*., 734 A.2d at 10.

In addition, since our Supreme Court modeled Pa.R.E. 406 after F.R.E. 406,[4] federal court decisions construing F.R.E. 406 are instructive in interpreting Pa.R.E. 406.[5] We find particularly persuasive the following analysis of habit evidence by the D.C. Circuit Court of Appeals:

> [H]abit refers to the type of nonvolitional activity that occurs with invariable regularity. It is the nonvolitional character of habit evidence that makes it probative. ***See, e.g., Levin v. United States***, 338 F.2d 265, 272 (D.C.Cir.1964) (testimony concerning religious practices not admissible because 'the very volitional basis of the activity raises serious questions as to its invariable nature, and hence its probative value') … Thus, habit is a *consistent* method or manner of responding to a particular stimulus. Habits have a reflexive, almost instinctive quality. The advisory committee notes on Rule 406 illustrate this point:
>
> > A habit ... is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving.

---

[4] ***See*** Comment, Pa.R.E. 406 ("this rule is identical to F.R.E. 406").

[5] ***See Commonwealth v. Hendricks***, 546 A.2d 79, 81 (Pa.Super.1986) (because Pennsylvania rule of criminal procedure is modeled after federal rule of criminal procedure, "our interpretation of the Pennsylvania rule is accordingly guided by reference to federal cases" interpreting federal rule); ***Cambanis v. Nationwide Ins. Co.,*** 501 A.2d 635, 637 n. 4 (Pa.Super.1985) (where Pennsylvania rule fashioned upon federal rule, federal case law is instructive); ***Michigan Bank v. Steensen,*** 236 A.2d 565, 566 n. 1 (Pa.Super.1967) (same).

> The doing of the habitual acts may become semi-automatic.

***Weil v. Seltzer***, 873 F.2d 1453, 1460 (D.C.Cir. 1989).

Unlike the foregoing examples of habit provided by Pennsylvania and federal courts, the manner in which Dr. Geller treated patients with Decedent's symptoms was not reflexive, instinctive, semi-automatic or mundane in nature. Medical patients are not manufactured on assembly lines; they each have unique attributes and idiosyncracies that call for individualized care. The notion that Dr. Geller treats each patient with Decedent's symptoms as reflexively as, for example, the manner in which he climbs stairs is preposterous. His proposed testimony fell well outside the boundaries of Pa.R.E. 406.

Even if this proposed testimony was relevant, the trial court properly excluded it under Pa.R.E. 403. This rule provides that "the court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In our view, the injection of testimony about Dr. Geller's father's cancer was a transparent ploy to generate sympathy for Dr. Geller's personal travails and divert the jury's attention from the core issue of whether he met the standard of care in his treatment of Decedent.

In his fourth argument on appeal, Dr. Geller objects to the following comments by Hospital's counsel during closing argument:

Roxborough Memorial Hospital agreed that we stand behind our doctors. They are our ostensible agents. What that means is if you find against Dr. Robins, Dr. Geller, or Dr. Aguirre, the judge later is going to assign responsibility also to Roxborough Memorial Hospital. So whatever award you would make against one will also be made against Roxborough Memorial Hospital.

Tr., 11/13/14, at 188-89. According to Dr. Geller, the jury misconstrued this remark to mean that any award will be paid by Hospital instead of by a doctor, so the jury did not have to worry that its verdict might cripple Dr. Geller financially.

Dr. Geller waived this argument due to his failure to object to this remark during closing argument or afterward. Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal"); *Craley v. Jet Equipment & Tools, Inc.*, 778 A.2d 701, 706-07 (Pa.Super.1997) (party's failure to object to opponent's closing argument constituted waiver).

Anticipating this waiver obstacle, Dr. Geller claims that he could not make any objections because the trial court directed counsel to refrain from objections during closing arguments, and it would have been "meaningless and futile" to object afterward. Given that the trial court instructed counsel to remain silent during closing argument, it is understandable that Dr. Geller's attorney did not object when Hospital's attorney made the remark in question. On the other hand, we are unconvinced by Dr. Geller's claim that a post-argument objection at sidebar would have been an exercise in futility. Had the court sustained a post-argument objection, it could have cured any

prejudice by instructing the jury not to construe Hospital's counsel's remarks in the manner feared by Dr. Geller, or, if it considered the prejudice irremediable, it could have declared a mistrial. Because Dr. Geller failed to make a post-argument objection, he cannot complain about Hospital's counsel's comment now.

Even if Dr. Geller had preserved this issue for appeal, Hospital's counsel's comment was proper. The parties stipulated during trial that Drs. Geller, Robins and Aguirre were ostensible agents of Hospital, which entitled Hospital to point out to the jury that any award it entered against these physicians would be entered against Hospital as well. Moreover, Dr. Geller's claim of prejudice rings hollow when we consider that the jury returned a verdict for Dr. Robins even though Hospital's counsel made the same comment about her during closing argument.

In his fifth argument, Dr. Geller complains that he had "very limited" time to present a key defense witness, his standard of care expert, Dr. Thomas Rebbecchi, because the trial court permitted Estate's attorney to use up most of the allotted time that day with repetitive questioning of two other witnesses. Dr. Geller waived this argument by failing to make any pertinent objection on the record. Pa.R.A.P. 302(a). Moreover, Dr. Geller fails to identify any subjects about which his expert could not testify due to the alleged time limitation.

In his sixth argument, Dr. Geller argues that Judge Allen violated his constitutional rights by disqualifying attorney Raynor from the second trial. We disagree.

Before addressing the substance of this issue, we dispose of several waiver questions. The Estate argues that Dr. Geller waived this issue by not raising it himself until post-trial motions in 2014. The Estate claims that only Raynor objected to disqualification at the time of the Estate's disqualification motion in 2012. Review of the record indicates, however, that Raynor appeared at the hearing before Judge Allen on April 19, 2012 in her capacity as counsel for Dr. Geller. Thus, Raynor opposed the Estate's motion on Dr. Geller's behalf, which preserved his right to object to her disqualification on appeal.

The Estate also argues that Dr. Geller waived this issue by failing to appeal Raynor's disqualification before the second trial. An order disqualifying counsel in a civil case is a non-appealable interlocutory order, ***Vaccone v. Syken***, 899 A.2d 1103, 1108 (Pa.2006), and is not appealable under the collateral order doctrine. ***Id***. at 1107-08. Thus, Dr. Geller could not appeal this issue until after a final order, which did not occur here until after the second trial.

The Estate also claims that Dr. Geller should have objected to Raynor's disqualification during Dr. Geller's appeal after the first trial from Judge Panepinto's order granting a new trial. Again, we disagree. In

***Banohashim v. R.S. Enterprises, LLC***, 77 A.3d 14 (Pa.Super.2013), we held, in an interlocutory appeal from an order awarding a new trial:

> [W]e do not have jurisdiction to consider Appellant's remaining claims on appeal—wherein Appellant claims that the trial court erred in denying its request for a compulsory nonsuit and in denying its motion *in limine.* Appellant has appealed, as of right, from the interlocutory order granting Ms. Banohashim's post-trial motion for a new trial. Pa.R.A.P. 311(a)(6). While the trial court's July 25, 2012 interlocutory order is appealable under Pennsylvania Rule of Appellate Procedure 311, the order is not final and, thus, the order does not draw into question the propriety of [the other] non-final orders in the case … Rather, as to the remaining issues, the relevant orders must be appealable in their own right. Yet, as to the remaining issues, the relevant orders are not appealable as of right (*per* Pa.R.A.P. 311), are not appealable by permission (*per* Pa.R.A.P. 312), and are not collateral orders (*per* Pa.R.A.P. 313).

***Id***. at 27 n. 6. Pursuant to ***Banohashim***, when Judge Panepinto granted a new trial, the only issue that Dr. Geller could appeal at 3246 EDA 2012 was whether Judge Panepinto abused his discretion in awarding a new trial. All other non-final issues, such as Raynor's disqualification, were not appealable at 3246 EDA 2012. ***Id****.* The first opportunity Dr. Geller had to contest Raynor's disqualification was after the second trial via post-trial motions. He raised this issue in post-trial motions and again in this appeal. There was no waiver.

Turning to the merits, disqualification of counsel is a serious remedy that the court should use only when due process so requires. In ***McCarthy v. Southeastern Pennsylvania Transportation Authority***, 772 A.2d 987 (Pa.Super.2001), we elaborated:

In ***Commonwealth v. Lambert***, 765 A.2d 306 (Pa.Super.2000), this Court … stated that a trial court may sanction, warn or recommend disciplinary action against an attorney who has violated a Rule of Professional Conduct. ***Lambert***, 765 A.2d at 345-46. Although disqualification and removal is an appropriate sanction in some cases, it is a serious remedy 'which must be imposed with an awareness of the important interests of a client in representation by counsel of the client's choice.' ***Slater v. Rimar, Inc.,*** [] 338 A.2d 584, 590 ([Pa.]1975) …

A court's authority to disqualify counsel based on Rules of Professional Conduct is limited.  In ***In re Estate of Pedrick***, [] 482 A.2d 215 ([Pa.]1984), our Supreme Court stated that 'this court has held in several cases that counsel can be disqualified for violations of the [Rules of Professional Conduct] where disqualification is needed **to [e]nsure the parties receive the fair trial which due process requires.'** ***Pedrick***, 482 A.2d at 221 (emphasis added). Our Supreme Court continued:

> Thus, while it may be appropriate under certain circumstances for trial courts to enforce the Code of Professional Responsibility by disqualifying counsel or otherwise restraining his participation or conduct in litigation before them in order to protect the rights of litigants to a fair trial, we are not inclined to extend that enforcement power and allow our trial courts themselves to use the Canons to alter substantive law or to punish attorney misconduct.

***Id***.  In addition, our Supreme Court, in ***Reilly by Reilly v. SEPTA***, [] 489 A.2d 1291 ([Pa.]1985), limited the authority of both trial and appellate courts to sanction counsel for violations of the Rules of Professional Conduct as follows:

> Perceived violations of [the Rules of Professional Conduct] do not permit the trial courts or the intermediate appellate courts to alter the rules of law, evidentiary rules, presumptions or burdens of proof. More importantly, violations of those Codes are not a proper subject for consideration of the lower courts to impose punishment for attorney or judicial misconduct.

> \* \* \* \* \* \*

> [W]e have not abdicated or delegated any of our supervisory authority in enforcing these standards of conduct to the Superior Court. To presume that the Code or its alleged violations can be reviewed by any tribunal other than those we authorize is a misapprehension of the purpose of the Code, and is seen as an impermissible meddling into the administrative and supervisory functions of this Court over the entire judiciary.

*Id*. at 991-92 (emphasis in original). Merely because an attorney violates a Rule of Professional Conduct does not warrant her disqualification from a case. But if an attorney's conduct disrupts or threatens to disrupt the "fair trial which due process requires," the trial court should disqualify her. *See*, *e.g.*, *Pirillo v. Takiff*, 341 A.2d 896, 901, 906 (Pa.1975) (upholding disqualification of counsel to prevent him from representing more than one witness before grand jury, thereby compromising secrecy of grand jury proceedings); *United States v. Merlino*, 349 F.3d 144, 151-52 (3d Cir. 2003) (district court properly disqualified attorney for attempting to persuade witness represented by other counsel to refrain from testifying against attorney's client); *United States v. Greig*, 967 F.2d 1018, 1022–1023 (5th Cir.1992) (attorney who attempted to persuade his client's co-conspirator not to cooperate with government without informing co-conspirator's counsel had actual conflict of interest arising from his own unethical and possibly criminal behavior and should have been disqualified).

In this case, the evidence presented during the April 19, 2012 sanctions hearing demonstrates that on January 13, 2012, Raynor wrote to HUP that "if this is [Dr. Porges'] position and plaintiff[s'] attorneys become

aware of it, it could expose [HUP] to significant liability … I find it very difficult to believe that [Dr. Porges' opinion] could be the official position of [HUP] under these circumstances." This passage threatened that HUP would suffer in future medical malpractice lawsuits if Dr. Porges testified at trial in a manner consistent with her expert report. The clear intent of this passage was to pressure HUP into coercing Dr. Porges to either change her opinion or to refrain from testifying.

Subsequently, Raynor's associate, Judy Packett, wrote multiple times to counsel for the Estate demanding to know whether it still intended to have Dr. Porges give expert testimony. On March 16, 2012, Packett wrote: "Please advise as to whether Dr. Porges remains an expert who will testify on behalf of plaintiff at trial. To the extent she is not, kindly advise as to her replacement." In an email on March 19, 2012, Packett stated to one of the Estate's attorneys: "[Y]ou mentioned your preference to discuss the content of my letter (which I read to you over the phone) with co-counsel … before responding to it (i.e. advising as to the status of Dr. Porges as an expert on behalf of plaintiff). Given that trial is just two months away, this is information we are surely entitled to." On April 4, 2012, Packett wrote to both of the Estate's attorneys: "This letter follows up my prior correspondence dated March 16, 2012, to which I received no reply. Please advise as to whether Dr. Porges continues to serve as an expert on [the Estate's] behalf. To the extent she does not, kindly advise as to your

replacement as trial is only weeks away." On April 6, 2016, Packett wrote to both of the Estate's attorneys: "In light of the request for expert fees in [the Estate's] motion for sanctions, we can only assume that Dr. Porges is being replaced by a new expert. As trial is mere weeks away, kindly advise as to the identity of said expert, and provide us with a copy of his/her expert report, as soon as possible." These messages clearly assumed that Raynor's January 13, 2012 letter forced Dr. Porges to refrain from testifying, thus requiring the Estate to identify a new expert in Dr. Porges' place.

During the first hearing before Judge Allen, Raynor argued that her January 13, 2012 letter was equivalent to a polite "cocktail party conversation," i.e., it was simply a good faith effort to place a member of the medical community on notice of a potential problem. Judge Allen perceived, and we agree, that Raynor's letter was a threat made in bad faith. Had Raynor sent this letter as a Good Samaritan, Raynor would not have had Packett follow up with four letters to the Estate's attorneys demanding that the Estate identify a new expert. Packett's follow-up letters demonstrate that the purpose of Raynor's letter was to force Dr. Porges to change her testimony or refrain from testifying.

Nor did Packett's letters serve a valid purpose. Judge Allen observed during the April 19, 2012 hearing that when a party names a physician as an expert witness in pretrial documents, it is "common understanding" that the physician continues to serve as expert witness until the party provides notice

to the contrary. N.T., 4/19/12, at 36. Thus, there was no legitimate reason for Raynor to have Packett bombard the Estates' attorneys with letters requesting the identity of the Estate's new expert, for Raynor already knew that Dr. Porges remained in place as the Estate's expert witness until the Estate stated otherwise. The only purpose for Packett's letters was to advance Raynor's goal of forcing Dr. Porges to change her testimony or refrain from testifying.

By attempting to tamper with Dr. Porges' testimony, Raynor violated three Rules of Professional Conduct: **(1)** Pa.R.P.C. 3.4(a)(1), which prohibits a lawyer from "unlawfully obstruct[ing] another party's access to evidence"; **(2)** Pa.R.P.C. 4.4(a), which prohibits a lawyer from "us[ing] means" during her "representat[ion of] a client" that "have no substantial purpose other than to embarrass, delay or burden a third person"; and **(3)** Pa.R.P.C. 8.4(a), which provides that "it is professional misconduct for a lawyer to … violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so,[6] or do so through the acts of another." Through these transgressions, Raynor attempted to interfere with the Estate's due process right to a fair trial and the trial court's authority to administer justice. Moreover, Raynor forced the Estate to spend substantial

---

[6] In this case, Raynor "induce[d] another" to violate the Rules of Professional Conduct by having her associate, Packett, send communications to counsel for the Estate demanding to know whether Dr. Porges remained an expert.

sums to combat this misconduct by litigating its motion for sanctions before Judge Allen. Simply reporting Raynor to the Disciplinary Board under these circumstances would not have been a sufficient remedy. A mere request for a regulatory body to commence an investigation might not have dissuaded Raynor from continuing these tactics. Indeed, Raynor emphatically argued that she violated no rules and was entitled to continue her course of conduct. N.T., 4/19/12, at 25-27, 47. To prevent Raynor from continuing these egregious tactics in this case, and to assure due process and a fair trial, it was necessary to disqualify her as counsel.

Dr. Geller strenuously maintains that Judge Allen violated his constitutional right to counsel by removing Raynor from the case. The right to counsel is obviously a fundamental right, but it is not absolute. Trial courts have the authority to remove counsel when his or her conduct threatens due process. Judge Allen properly exercised that authority by removing Raynor as counsel. It also deserves mention that Raynor's removal caused no prejudice to Dr. Geller. Raynor's associates, Packett and Sollecito, had two years after Raynor's removal to prepare for Dr. Geller's second trial. Dr. Geller could easily have obtained new counsel during this interim but elected not to do so. Nor would it have helped him, because as the trial judge, Judge Massiah-Jackson, observed: "[T]his trial court enthusiastically concludes that Dr. Geller's … counsel [during his second trial] was well-prepared, competent and articulate, and a zealous and

effective advocate for her client." Memorandum In Support Of Orders Denying All Motions For Post-Trial Relief, at 24.

In his seventh argument, Dr. Geller raises multiple challenges to the trial court's calculation of delay damages. To frame these challenges in proper context, we recite the pertinent provisions of Pennsylvania's delay damage rule, Pa.R.Civ.P. 238:

> (a)(1) At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury … and shall become part of the verdict, decision or award.
>
> (2) Damages for delay shall be awarded for the period of time from a date one year after the date original process was first served in the action up to the date of the … verdict …
>
> (3) Damages for delay shall be calculated at the rate equal to the prime rate as listed in the first edition of the Wall Street Journal published for each calendar year for which the damages are awarded, plus one percent, not compounded.
>
> (b)(1) The period of time for which damages for delay shall be calculated under subdivision (a)(2) shall exclude the period of time, if any,
>
> (i) after the defendant made a written offer which complied with the requirements of subdivision (b)(2), provided that the plaintiff obtained a recovery which did not exceed the amount described in subdivision (b)(3), or
>
> (ii) during which the plaintiff caused delay of the trial.

We review rulings under Rule 238 for abuse of discretion. **Krebs v. United Ref. Co.**, 893 A.2d 776, 794 (Pa.Super.2006). We conclude that none of Dr. Geller's delay damage arguments have merit.

Dr. Geller first contends that the trial court abused its discretion by awarding delay damages to the Estate for the continuance from December 2011 to May 2012 due to the medical emergency of a co-defendant, Dr. Aguirre. Rule 238(b)(1)(ii), however, does not exclude delay caused by co-defendants such as Dr. Aguirre. Only when "the plaintiff cause[s] delay of the trial" is delay excludable. **See Schrock v. Albert Einstein Medical Center**, 589 A.2d 1103, 1106-07 (Pa.1991) (delay damages may be assessed even if defendant is free from fault in delay of trial).

Next, Dr. Geller contends that the trial court abused its discretion by awarding delay damages for the time period between July 2010 until May 2011. Dr. Geller claims this period is excludable because the Estate did not produce an expert report until May 2011. The trial court applied Rule 238 correctly. Since the first scheduled date of trial was December 2011, production of the expert report in May 2011 did not delay trial in any way.

Lastly, Dr. Geller argues that the delay between June 2012 and November 2013 -- the time period beginning with the verdict in the first trial and concluding with this Court's order affirming the award of a new trial – is excludable. Again, we disagree. Our Supreme Court has held that when the plaintiff appeals from the first verdict and wins a new trial, delay damages

accrue from the date of the verdict in the first trial until the date of the verdict in the second trial. ***Arthur v. Kuchar***, 682 A.2d 1250, 1255-56 (Pa.1996). Because ***Arthur*** holds that delay damages are available when the plaintiff prevails in an appeal seeking a new trial, delay damages must also be available when, as here, the defendants lose an appeal contesting the grant of a new trial.

The final argument at 1852 EDA 2015 is by REPA. REPA contends that since it was not on the verdict slip, the court erred by entering judgment against REPA. This argument is devoid of merit.

The parties stipulated on the record that Dr. Geller acted as an agent of REPA. Consequently, REPA was vicariously liable for Dr. Geller's negligence. Trial courts have the power to mold a jury's verdict to conform to the clear intent of the jury. ***Mitchell v. Gravely International, Inc.***, 698 A.2d 618, 623 (Pa.Super.1997). "Verdicts which are not technically correct in form but which manifest a clear intent on the part of the jury may be corrected without resort to further jury deliberations or the grant of a new trial." ***Id***. Based on the verdict against Dr. Geller and the stipulation that he was acting as REPA's agent, the trial court correctly entered judgment against REPA to conform to the clear intent of the jury.

### Raynor's appeal

Raynor raises two issues in her appeal:

- 31 -

> 1. Whether Raynor's appeal of the trial court's interlocutory pre-trial order was timely because it was filed within 30 days of the trial court's *final* order denying post-trial motions?
>
> 2. Whether the trial court erred in imposing $44,693.25 in sanctions on … Raynor in circumstances where: (i) the trial court lacked jurisdiction to sanction an attorney for violations of the Rules of Professional Conduct; (ii) the trial court never found that Raynor's conduct actually violated any Rule of Professional Conduct; (iii) the trial court identified no evidence whatsoever to establish that Raynor's conduct affected the outcome of the case or in any way 'obstructed' the proceedings, and; (iv) the trial court offered no justification for the $44,693.25 sanction award it rendered?

Brief For Raynor, at 4.

Judge Allen opined that Raynor's appeal is untimely, because she should have appealed either (1) when Judge Panepinto granted a new trial, (2) when this Court affirmed the grant of a new trial, or (3) prior to the second trial. In response, Raynor contends, in her first argument on appeal, that her appeal is timely because her right to appeal only ripened after Judge Massiah-Jackson entered judgment against Dr. Geller and REPA.

We agree with Raynor that her appeal is timely. The sanctions order against Raynor did not fall within any category of interlocutory orders that are appealable as of right under Pa.R.A.P. 311. Although Judge Panepinto's order granting a new trial was appealable as of right under Pa.R.A.P. 311(a)(6), an interlocutory appeal from an order granting a new trial is not a vehicle for appealing other non-final orders such as the sanctions order against Raynor. *Banohashim*, 77 A.3d at 27 n. 6. Nor is there any authority for the propositions that this Court's affirmance of an order

granting a new trial triggered Raynor's right to appeal her sanctions order, or that Raynor enjoyed some right of interlocutory appeal on remand from our order affirming the grant of a new trial.

Raynor could not appeal her sanctions order until after entry of a final order disposing of all claims and all parties. Pa.R.A.P. 341(b)(1). The final order in this case was Judge Massiah-Jackson's order denying the defendants' post-verdict motions, granting the Estate's motion for delay damages and entering judgment in favor of the Estate. ***Printed Image of York, Inc. v. Mifflin Press, Ltd.***, 133 A.3d 55, 58 n. 6 (Pa.Super.2016) (appeal in civil case in which post-trial motions are filed lies from entry of judgment). Only when Judge Massiah-Jackson entered judgment did Raynor's sanctions order become appealable. ***Betz v. Pneumo Abex, LLC***, 44 A.3d 27, 54 (Pa.2012) (appeal of final order encompasses appeal of all interlocutory orders that were previously non-appealable).

We turn to Raynor's second argument, a claim that Judge Allen abused her discretion in ordering Raynor to pay $44,693.25 in sanctions. This issue consists of two sub-arguments: (1) did Judge Allen have the authority to impose attorney fees and expenses as a sanction; and (2) was the actual amount of the sanction proper?

In our view, in addition to disqualifying Raynor as counsel, Judge Allen had the authority to impose attorney fees and expenses against Raynor. The court may award counsel fees against "participant[s]" for "dilatory,

obdurate or *vexatious* conduct during the pendency of a matter." 42 Pa.C.S. § 2503(7) (emphasis added). "Participant[s]" include "[l]itigants, witnesses and their counsel." 42 Pa.C.S. § 102. Thus, attorneys are subject to attorney fees as a sanction under section 2503(7). Both this Court and the Commonwealth Court have upheld sanctions against attorneys under this provision. *See Estate of Liscio*, 638 A.2d 1019, 1022 (Pa.Super.1994) (attorney of party was properly held liable under section 2503(7) for attorney fees and costs, where attorney knew or should have known that party's claim was without merit; counsel filed action on behalf of party against estate of alleged natural father with knowledge that party had been adopted and with knowledge that law prohibits adopted children from recovering from their natural parents' estates); *Simmons v. City of Philadelphia*, 471 A.2d 909, 911 (Pa.Cmwlth.1984) (attorney held liable under section 2503(7) for continuing to assert previously adjudicated and rejected defenses).

We have held above that Judge Allen properly disqualified Raynor because her conduct threatened to impede the Estate's due process right to a fair trial and the court's authority to administer justice. Disqualification alone, however, was not a sufficient remedy, because the Estate had to incur substantial expenses in order to obtain the disqualification order. The additional sanction of attorney fees was necessary under section 2503(7) to provide the Estate with a full and complete remedy for Raynor's vexatious

tactics. *Id.*; *see also* 42 Pa.C.S. § 323 ("except as otherwise prescribed by general rules, every court shall have power to make such rules and orders of court as the interest of justice or the business of the court may require").

Raynor's challenge to the amount of attorney fees is devoid of merit. During the sanctions hearing on August 9, 2012, the Estate submitted an exhibit that it incurred $45,694.25 in attorney fees and expenses in connection with prosecuting its motions for sanctions. In particular, the Estate sought the value of time incurred in (1) preparing or responding to nine court filings[7] and (2) preparing for and attending two hearings on the sanctions issue. Raynor, represented by her own attorney, did not ask to examine counsel for the Estate, submit evidence in opposition to the exhibit, or object to the exhibit's admissibility. Judge Allen provided Raynor with ten days to submit any additional evidence or argument concerning the Estate's fee request. Raynor filed a memorandum opposing sanctions but did not submit any additional evidence. The Estate responded with a supplemental memorandum which stated that in addition to the two hearings on April 19,

---

[7] The nine filings were: (1) the Estate's Motion for Sanctions Against Raynor; (2) Raynor's Response to the Motion for Sanctions; (3) the Estate's Reply thereto; (4) the Estate's Supplemental Brief on Motion for Sanctions Regarding the Motivations of Raynor in Engaging in Attempted Witness Intimidation; (5) Raynor's Objections to Plaintiff's Praecipe to Attach Exhibit G; (6) Plaintiff's Response thereto; (7) Raynor's Cross-Motion for Sanctions Against the Estate's Counsel; (8) The Estate's Counsel's Response to Raynor's Cross-Motion; and (9) Raynor's Motion for Reconsideration of the Court's Denial of her Cross-Motion for Sanctions Against the Estate's Counsel.

2012 and August 9, 2012, it filed multiple memoranda relating to its motion for sanctions. Based on this record, Judge Allen ordered Raynor to pay $44,693.25 in attorney fees to the Estate.

In this Court, Raynor argues in boilerplate fashion that Judge Allen "made no evidentiary findings" and "offered absolutely no other justification for the $44,693.25 sanction …" Brief For Raynor, at 21. We disagree. The Estate presented evidence during the sanctions hearing in the form of an exhibit that itemized its attorney fees. The Estate buttressed this evidence with memoranda delineating the efforts it had to make in the course of seeking sanctions. The Estate thus furnished Judge Allen with a sufficient foundation to impose monetary sanctions under 42 Pa.C.S. § 2503(7). Furthermore, in her appellate briefing, Raynor fails to challenge any particular item of attorney fees or expenses sought by the Estate; she simply asserts that they were excessive *in toto*. Because Raynor fails to argue in this Court that any particular item was excessive, we see no reason to exclude any item from the sanctions award. As a result, the sanctions award remains fully intact.

For the foregoing reasons, we see no reason to disturb the judgment entered against Dr. Geller and REPA or the sanctions entered by Judge Allen against Raynor. The Estate is authorized to file a bill of costs that includes these sanctions.

Judgment affirmed; order imposing sanctions affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/15/2016