J-A24006-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| ELEANOR CARPENTER AND MARIE G. CARPENTER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| MASTER REMODELERS, INC. A CORPORATION | |
| Appellants | No. 184 WDA 2017 |

Appeal from the Judgment Entered March 1, 2017
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): AR 13-000699

BEFORE:  MOULTON, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY MOULTON, J.:          FILED DECEMBER 28, 2017

Master Remodelers, Inc. ("Master")[1] appeals from the March 1, 2017

judgment entered in the Allegheny County Court of Common Pleas in favor of

Eleanor and Marie G. Carpenter ("the Carpenters") and against Master

following a non-jury trial.  We affirm.

On July 7, 2009, the Carpenters and Master entered into a contract

("Agreement") wherein Master agreed to construct a two-story addition to the

Carpenters' home for approximately $173,000.  Master also agreed to

construct a 4-foot-by-18-foot concrete sidewalk leading to the addition and to

install downspouts and drainage lines.  Master started work on August 31,

_____

[1] Master is owned by Regis McQuaide, who was a party to this action throughout the majority of the litigation.  McQuaide was released from this action by stipulation prior to the trial court's verdict.

2009 and completed the project in December 2009. N.T., 9/16/16, at 102-04 ("N.T. Trial"). In the Agreement, Master guaranteed its work to be free from defects in workmanship for a period of one year from the completed date. Id. at 130, 169. Within one year of Master completing the addition, the Carpenters noticed water trickling into the basement of the home. Id. at 106. The Carpenters, however, took no action at that time, because they were not "sure what was causing the water to come in." Id. at 107.

In 2012, after the Carpenters had hired Nellis Contractors ("Nellis"), operated by Charles Nellis and his son Christopher, to maintain and landscape their property, id. at 107-08, Marie Carpenter told Charles that water had been collecting in the air conditioner condenser, id. at 108-09. Christopher then told Marie that she should have an HVAC technician raise or move the air conditioning unit to correct the problem. Id. at 110.

In September 2012, Nellis replaced the sidewalk installed by Master because it pitched toward the house rather than away from the house. Id. at 49, 80. Christopher explained the problem as follows:

> [CARPENTERS' COUNSEL]: Now, your father discussed a little bit about and said you could give us a little better idea of why -- what the pitch on the sidewalk was and what it was doing. Can you explain to the Court why it wasn't graded properly in your opinion?
>
> [CHRISTOPHER NELLIS]: Well, when you put the water on it, you noticed along within the first two inches off of the actual new addition, the first -- within the first two inches there was actually a puddle. It wasn't probably any more than a quarter inch all the way down depth-wise. It was puddling along there. It ran the whole course from the corner of the house until about two feet before the end of

- 2 -

the addition it stopped. So at that point there was like a little puddle like no more than a quarter inch deep. It was still holding water there. That was the puddle part. Then the water flow -- actually if you put water on, it would run towards the addition. Now, towards where the steps were on that house and towards the end of the addition, the water did correct itself and run back off towards the lawn. But at that point it was only a matter of two feet, so it wasn't like you could actually cut it at an expansion joint or a false joint and replace only the section that was bad. It was all one piece and it was all tied in together.

Id. at 82-83. Marie Carpenter testified that Nellis showed them "how . . . water was running back towards the house" using a level. Id. at 118. Charles testified that Nellis also had to replace the wood board underneath the slab because the pitch of the existing sidewalk caused it to rot. Id. at 50.

The Nellises also testified that the positioning of the home's air conditioner relative to the new addition created a water drainage problem. When the Carpenters had Nellis look at the property, after construction of the addition, Marie told them that the air conditioner was "about a foot below the grade level" and that they kept "getting water in the air conditioning unit." Id. at 108. On cross-examination, Marie admitted that the Agreement did not contain any references to work on the air conditioner. Id. at 133. Eleanor Carpenter confirmed that work on the air conditioner was not in the contract or proposal but said that "common sense says that if you see something at ground level when you are starting the work then you leave it at ground level." Id. at 149. Eleanor also stated that Master gave them a design picture that showed a proposed layout of the addition, but she and her sister "did not know there would be a problem with the . . . air conditioner until [they] started to

- 3 -

see water standing there with the condenser and . . . running in towards the house into the basement." Id. at 150.

Nellis also replaced two downspouts that had been installed by Master. Id. at 55. Christopher explained the downspout issues as follows:

> There were actually three different situations with the downspout pipes I noticed firsthand because I was the one there working on it. . . . The first one where the downspout came down . . . where that downspout is, that pipe actually came at almost like a 45 degree angle off the corner of the addition and the house, went out about eight feet and stopped. It went absolutely nowhere but to the ground. It was dead-ended. I don't have another picture of it. But there was another picture floating around that had a downspout that was actually at the corner of the existing house. Whether or not McQuaide did anything with that I don't know, but that one was also five foot out and stopped. It went nowhere. There was no gravel pit in order for the water to actually drain to, which could have also caused the, you know, the foundation or water leak in the back of the foundation. The third downspout which was at the front door to the right side, that was tied into a pipe that went from the front of the house to the road. The trouble with that, the grading which the downspout was at was lower than the grading of the road. Basically you can't get water to flow uphill unless you have a pump. So we had – that's what prompted us to put in a sump pump system and then have it pumped through an inch-and-a-half line to the road where it could drain.

Id. at 84-85.

Shortly after Nellis began the remediation work, McQuaide stopped by the Carpenters' property on a Saturday when Nellis was not there. Id. at 111. Marie testified that Eleanor took McQuaide around the property and showed him the water pooling issues. Id. at 111-12. Additionally, Marie testified that Eleanor told McQuaide that the air conditioner unit should not have been left

where it was, and that the decorative trim on the new addition was damaged. Id. at 113. Marie further testified that McQuaide came to the property in 2010 to fix the double doors on the new addition, but did not fix the concrete or downspouts and that McQuaide did not ask for the opportunity to fix these issues. Id. at 113-14. On November 25, 2012, Marie sent a letter to McQuaide and Master, outlining the issues that Nellis had to fix and the cost of that work, which the letter said totaled $7,600. Id. at 115. Marie stated that she did not tell McQuaide about the sidewalk before September 2012, including during his visit in 2010, because she "didn't know there was anything wrong with the [side]walk." Id. at 122, 133-34. Additionally, she testified that she did not contact McQuaide immediately after Nellis told her about the problem because she just wanted the issue fixed. Id. at 123.

Eleanor Carpenter testified that when McQuaide stopped by the property in September 2012, she showed him the various issues with the water drainage around the property. Id. at 144-45. Further, Eleanor stated that she had attempted to call McQuaide in 2010 about other issues, left messages, and received no response. Id. at 146. She admitted that the only written communication regarding the issues raised by Nellis was Marie's November 25, 2012 letter. Id. at 146-47. When she discussed the issues with Nellis, she told Nellis that "McQuaide never returns phone calls. . . . [or] when we leave a message nothing happens." Id. at 147. Eleanor stated that McQuaide never asked why the Carpenters hired another contractor or who that other contractor was. Id. at 149. On cross-examination, Eleanor admitted that

when she was deposed by Master's counsel on whether she had attempted to contact Master and McQuaide between 2009 and 2012, she stated that she had not. Id. at 152. Eleanor explained that she had, or was having, a "senior moment." Id.

Finally, McQuaide testified on his own behalf and on behalf of Master. McQuaide stated that within one year of completing the addition, the Carpenters contacted him about an issue with the door to the addition, but did not contact him about the air conditioner, sidewalk, or water in the basement until he stopped at the property in September 2012. Id. at 169-71. McQuaide stated that he remembered pouring the concrete for the sidewalk, because Master "overdug" the pit and had to place a plank across the ditch and filled it with gravel packed with geotextile cloth. Id. at 172. He said that he was surprised when the Carpenters told him that there was a water problem, because all the material in there "acts like a big sump." Id. McQuaide further testified that he did not see the issues because by the time he returned, the sidewalk had been replaced. Id. at 173.

McQuaide testified that neither he nor anyone else from Master worked on the air conditioner unit, which was set up by the living room window in 2009. Id. at 168, 176, 179. McQuaide also stated that he did not think that his work on the addition would have changed the level of the air conditioner unit, and that he could not "see how there would be water in the unit." Id. at 179. McQuaide did, however, admit that Nellis's pad and drain system for the air conditioner "made sense" because the Carpenters had installed a generator

- 6 -

at grade level. Id. at 174. McQuaide also testified that he was never given the opportunity to inspect the alleged defects in Master's workmanship. Id. at 180-81.

With respect to the downspouts, McQuaide testified that they installed a downspout through the concrete and "tied it into the existing storm-water system." Id. at 181. McQuaide believed that he had done so in a workmanlike manner. Id. at 182.

On cross-examination, McQuaide admitted that the Carpenters had shown him some issues with their property in September 2012, but stated that he was "flabbergasted" when he received the Carpenters' letter in November 2012. Id. at 190. McQuaide could not remember whether the Carpenters had shown him the issues with the walkway and air conditioner in September 2012. Id. at 188-89.

On July 19, 2016, shortly before trial, Master filed an emergency motion for leave of court to file a motion for summary judgment, to which it attached a motion for summary judgment based on spoliation of evidence. Master argued for dismissal because neither Master nor McQuaide had had an opportunity to inspect the allegedly deficient work. Master also filed a number of pre-trial motions in limine. On September 16, 2016, the day of trial, the trial court granted some of the motions in limine, denied others, and held others in abeyance for trial. The trial court then denied summary judgment and tried the matter before it without a jury.

On September 22, 2016, the trial court rendered a verdict in favor of the Carpenters and against Master for $7,660.00. On September 29, 2016, the trial court filed an opinion supporting its verdict:

> This is a breach of contract case arising from a remodeling contract entered into between the parties in July 2009. The contract was for the erection of a sunroom and game room addition to the [Carpenters'] home. [The Carpenters] claim [Master] breached the contract in that there were problems with various aspects of [Master's] work.
>
> [The Carpenters] testified they called [McQuaide] numerous times prior to 2012 and [neither McQuaide nor Master] . . . respond[ed]. In September 2012, inadvertently, [McQuaide] drove by and saw work being done at [the Carpenters'] home. Both parties agree that they looked at the issues of concern, but neither side remembers all the specifics of that site meeting. We do know [the Carpenters] thought it was useless to ask [McQuaide or Master] to return due to lack of response by [McQuaide or Master]. [The Carpenters] used the services of a second contractor, Nellis, to make corrections based on this premise, and sent a letter to [McQuaide and Master] on November 25, 2012 detailing their demands again. [McQuaide] testified he responded but was flabbergasted by the issues listed in the letter, and in an effort to not be argumentative with the elderly [Carpenters], was non-committed on making the repairs.
>
> The second contractor, Nellis, testified about the condition of the sidewalks, grading and downspouts at the [Carpenters'] home. They verified the problems and the water/drainage issues of [the Carpenters]. (Example: concrete sidewalk slanted towards the house and storm water, pipes to nowhere.) While no photos were taken by them, there is no evidence to indicate that either [the Carpenters] or [Nellis] were intentionally and purposely destroying evidence of the initial work of [Master].
>
> [Master] contends [it] should have been given an opportunity to cure the issues detailed by [the Carpenters].

But based on the testimony of all the parties, especially [McQuaide] who had no file for the job, phone log, memo to the file on the property, and his allowance of the [Carpenters] to at least think he would entertain correction when in fact he had no intention to do so, the [Carpenters'] reasoning to look elsewhere to correct the problems were understandable.

Likewise, [McQuaide] admitted that while a provision existed in the agreement that work was guaranteed for one year and that they would be able to fix problems first; [McQuaide] also admitted [that Master is] in the service industry and . . . work[s] to satisfy customers beyond the one year period.

Award for [the Carpenters] in amount of $7,660.00 as per [their] November 25, 2012 letter . . .

Trial Ct. Op., 9/29/16, at 1-2.

On September 30, 2016, Master filed timely post-trial motions asserting that: (1) the Carpenters failed to meet their burden of proof; (2) the trial court erred in denying a spoliation sanction because the Carpenters removed Master's work before McQuaide or anyone else from Master could inspect it; (3) in its damages calculation, the trial court improperly included $225 for a broken pipe, which the trial court excluded from trial testimony based on Master's motion in limine; and (4) the trial court's verdict was against the weight of the evidence. On January 3, 2017, the trial court granted the post-trial motion to modify the damages and reduced the Carpenters' award to

$7,435, but denied the remainder of Master's post-trial motions. On January 26, 2017, Master timely filed a notice of appeal.[2]

Master raises the following issues on appeal:

1. Whether the Trial Court abused its discretion and/or committed an error of law by finding or ruling that the Carpenters . . . satisfied their burden of proof, despite the fact that they failed to preserve critical evidence that would support their claims and failed to provide [Master] an opportunity to inspect the work that was the subject [of] their claims, in direct contravention of Pennsylvania law concerning spoliation[.]

2. Whether the Trial Court abused its discretion and/or committed an error of law by finding or ruling that the Carpenters met their burden of proof, despite the fact that the Carpenters introduced no testimony or evidence showing that [Master] had breached any provision of the [Agreement] between the Carpenters and [Master] or that such breach resulted in damages to the Carpenters[.]

3. Whether the Trial Court abused its discretion and/or committed an error of law by finding or ruling that the Carpenters "testified they called [Master] numerous times prior to 2012 and [Master] did not respond" when in fact, on cross examination the Carpenters admitted that they never tried to contact [Master] regarding the alleged defects at issue until after September 2012[.]

_____

[2] On February 17, 2017, this Court issued a rule on Master to show cause why the appeal should not be dismissed. The rule informed Master that its appeal was interlocutory because judgment had not been entered on the docket and instructing it to provide proof to this Court within 14 days that judgment has been entered. On March 2, 2017, Master filed a response, to which it attached a praecipe to enter judgment filed with the trial court on March 1, 2017. On March 7, 2017, we discharged the rule. While Master filed its notice of appeal on January 3, 2017, we nevertheless have jurisdiction over this appeal because judgment was subsequently entered on the docket. See Jones v. Rivera, 866 A.2d 1148, 1149 n.1 (Pa.Super. 2005).

4. Whether the Trial Court abused its discretion and/or committed an error of law by finding or ruling that [Master] had any opportunity to repair the alleged defects[.]

5. Whether the Trial Court abused its discretion and/or committed an error of law by finding or ruling that the Carpenters' and a third-party contractor's destruction of evidence was irrelevant so long as they did not destroy the evidence "intentionally and purposely."

6. Whether the Trial Court abused its discretion and/or committed an error of law by improperly shifting the burden of proof to [Master] through the apparent imposition of a recordkeeping requirement[.]

7. Whether the Trial Court abused its discretion and/or committed an error of law by finding or ruling that [Master]'s recordkeeping procedures were in any way relevant to the Carpenters' failure to give [Master] an opportunity to cure the alleged defects[.]

8. Whether the Trial Court abused its discretion and/or committed an error of law by imposing on [Master] a contractual obligation to guarantee its work beyond the one-year period set forth in the Agreement[.]

9. Whether the Trial Court abused its discretion and/or committed an error of law by awarding the Carpenters damages associated with the air-conditioning unit located on their property in the amount of $3,200.00, despite the fact that evidence unequivocally showed that [Master] was not required to perform any work on the air-conditioning unit under the Agreement, and in fact, did not perform any such work[.]

10. Whether the Trial Court abused its discretion and/or committed an error of law by awarding the Carpenters damages associated with the air-conditioning unit located on their property, despite the fact that the Trial Court issued an order prohibiting the Carpenters from seeking damages associated with work performed on the air-conditioning unit, and only permitted the Carpenters to seek damages pertaining to the grading of ground under the air-conditioning unit[.]

11. Whether the Trial Court abused its discretion and/or committed an error of law by awarding the Carpenters damages associated with the air-conditioning unit against the unequivocal weight of the evidence and despite having no factual or legal basis for such award[.]

12. Whether the Trial Court abused its discretion and/or committed an error of law by awarding the Carpenters damages in the amount of $3,860.00 based upon the grading of a cement walkway on their property against the unequivocal weight of the evidence and despite having no factual or legal basis for such award[.]

13. Whether the Trial Court abused its discretion and/or committed an error of law by awarding the Carpenters damages in the amount of $375.00 based upon the replacement of an allegedly broken downspout and associated pipe against the unequivocal weight of the evidence and despite having no factual or legal basis for such award[.]

Master's Br. at 8-11 (trial court answers omitted).  While Master raises 13 issues, we have consolidated them into three categories as Master did in its brief.[3]

_____

[3] We note that Pennsylvania Rule of Appellate Procedure 2116(a) requires that the statement of questions involved "state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail."  Indeed,

> [t]he approach to appellate advocacy embarked on by present counsel for [Master] brings to mind the words of the Honorable Ruggero J. Aldisert of the United States Court of Appeals for the Third Circuit:
>
>> With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible

I. Spoliation of Evidence

Master first argues that the Carpenters' case should have been dismissed because they failed to preserve evidence of the damages caused by Master's alleged breaches of contract. According to Master, the Carpenters "did not preserve the condition of the [p]roperty and did not afford [Master] an opportunity to inspect the [p]roperty before the Carpenters directed Nellis to remove and replace the allegedly defective items, thereby destroying evidence critical to the Carpenters' claims. Master's Br. at 36. Master claims it was prejudiced by this destruction, as Master could not see the alleged defects and, as a result, could not "properly defend against the Carpenters' claims and . . . permitted the Carpenters to conjure up claims for costs associated with alleged reparation work that did not need to be performed and/or for which [Master] is not responsible." Id. at 37. Additionally, Master asserts that no lesser sanction than dismissal was appropriate because "the

_____

> errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them . . . [and] it is [this] presumption . . . that reduces the effectiveness of appellate advocacy.
>
> Aldisert, "The Appellate Bar: Professional Competence and Professional Responsibility—A View From the Jaundiced Eye of the Appellate Judge," 11 Cap. U.L. Rev. 445, 458 (1982) (emphasis in original).

Commonwealth v. Robinson, 864 A.2d 460, 480 n.28 (Pa. 2004) (some alterations in original). We decline, however, to find waiver on this basis given that Master limited its argument to three principal issues.

- 13 -

voluntary destruction by Carpenter of the work completed by [Master] prevent[ed Master] from offering any substantive defense to the claims of the Carpenters." Id. at 38. We disagree.

We review trial court rulings on spoliation claims for an abuse of discretion. Mt. Olivet Tabernacle Church v. Edwin L. Wiegand Div., 781 A.2d 1263, 1269 (Pa.Super. 2001). With respect to spoliation issues, this Court has explained:

> "Spoliation of evidence" is the non-preservation or significant alteration of evidence for pending or future litigation. When a party to a suit has been charged with spoliating evidence in that suit (sometimes called "first-party spoliation"), we have allowed trial courts to exercise their discretion to impose a range of sanctions against the spoliator.

PTSI, Inc. v. Haley, 71 A.3d 304, 315 (Pa.Super. 2013) (quoting Pyeritz v. Commonwealth, 32 A.3d 687, 692 (Pa. 2011) (internal citations and footnotes omitted)). The trial court must weigh three factors to determine the appropriate sanction for spoliation:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

Id. (quoting Creazzo v. Medtronic, Inc., 903 A.2d 24, 29 (Pa.Super. 2006)). In assessing the "degree of fault of the party who altered or destroyed the evidence," the trial court must consider (1) "the extent of the offending party's duty or responsibility to preserve the relevant evidence, and [(2)] the

- 14 -

presence or absence of bad faith." Id. (quoting Creazzo, 903 A.2d at 29). "Where fault and prejudice are not severe, dismissal is inappropriate." Mt. Olivet, 781 A.2d at 1273.

The trial court concluded that dismissal was inappropriate, finding that "there was no evidence to indicate that either [the Carpenters] or [Nellis] were intentionally and purposely destroying evidence of the initial work of [Master]." 1925(a) Op. at 3. We conclude that the trial court did not abuse its discretion.

First, the Carpenters attempted to contact Master beginning in 2010 regarding other issues with Master's work under the agreement. Although the Carpenters elected not to notify Master about the issues in writing, the Carpenters' trial testimony supports the trial court's conclusion that their "reasoning to look elsewhere to correct the problems [at issue in this case was] understandable." Id.

Second, we cannot conclude that the Carpenters acted in bad faith. Again, the record supports the trial court's finding that the Carpenters called Master multiple times in 2010. Believing that any further efforts in 2012 would be useless, the Carpenters hired Nellis to fix the work and prevent any further damage to their home. Nothing in the record indicates that the Carpenters intentionally destroyed Master's work in order to prevent Master from inspecting the claimed problems. Rather, the Carpenters undertook appropriate remediation efforts.

Third, Master was not highly prejudiced by the Carpenters' failure to preserve the allegedly defective conditions. Before trial, both parties argued a number of motions in limine, including two motions regarding the availability of photographs taken by Nellis during the repairs in September 2012, which the Carpenters had provided to Master two days before trial. The trial court delayed the start of the non-jury trial to 1:30 p.m. and instructed the parties to inspect the photographs and consult with their clients. When the trial court reconvened in the afternoon, Master withdrew its motions in limine regarding these photographs. Further, after an off-the-record discussion, the trial court stated:

> So we have agreed to the fact, all of us, right, that the photos that are being provided by Nellis Contracting will be submitted to both counsel on defense side so they are able to utilize those for cross and whatever they are going to use them for and so they can blow them up and so that everybody can see. Those photos shall be provided to the Court after today, hopefully within, you know, 24 hours or so forth or by Monday if you can. And I would assume — and, by the way, we don't have a color printer. This is bare bones.

N.T., 8/24/16, at 32. Thus, Master had access to photographs of at least some of the conditions that existed when Nellis did the remediation work.[4] Additionally, McQuaide testified that he observed the conditions at the property in September 2012 when he stopped by.

_____

[4] While the Carpenters certainly could have turned over these photos earlier in the litigation, we note that Master was still given time to inspect them before trial.

Accordingly, the trial court did not abuse its discretion by determining that dismissal was not an appropriate sanction for the Carpenters' failure to preserve Master's work and did not err in denying Master's motion for summary judgment.

II.    Burden of Proof

Next, Master argues that the Carpenters failed to meet their burden of proof on their breach of contract claim. Master contends that the Carpenters "did not come forward with any evidence to establish that [Master] breached any duty imposed by the [a]greement or that any such breach resulted in damages to the Carpenters." Master's Br. at 30. According to Master, the Carpenters did not offer expert testimony that established the breach, nor did they "identify any contractual duty that [Master] breached or produce any evidence to demonstrate that [Master] breached any such duty." Id. at 32. Master asserts that "neither Christopher nor Charles Nellis was offered as an expert, review[ed] the Agreement, or observed any work completed by [Master] until September 2012," id. at 31, "the Agreement included a one-year warranty on all work completed" and the Carpenters did not contact Master about these issues until September 2012, id., and the Carpenters failed to establish that the condition of the walkway in September 2012 was a result of Master's work.

Our standard for reviewing a non-jury trial verdict is:

> to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The

- 17 -

findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue concerns a question of law our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

Stephan v. Waldron Elec. Heating and Cooling LLC, 100 A.3d 660, 664-65 (Pa.Super. 2014) (quoting Wyatt, Inc. v. Citizens Bank of Pa., 976 A2d 557, 564 (Pa.Super. 2009)).

To prevail on a breach of contract claim, the plaintiff must show "(1) the existence of a contract, including its essential terms, (2) a breach of the contract[,] and (3) resultant damages." Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016). With respect to performing contracts in a workmanlike manner, this court has stated that

[w]here skill, as well as care is required in performing the undertaking, if the party purports to have skill in the business, and he undertakes for hire, he is bound to the exercise of due and ordinary skill in the employment of his art of business about it, or, in other words, to perform it in a workmanlike manner.

Mort Co. v. Paul, 76 A.2d 445, 447 (Pa.Super. 1950) (quoting Waugh v. Shunk, 20 Pa. 130, 133 (1852)). In Waugh, our Supreme Court further stated that the party "must be understood to have engaged to use a degree

of diligence, and attention, and skill adequate to the performance of his undertaking. It is his own fault if he undertake without sufficient skill, or applies less than the occasion requires." 20 Pa. at 133.

We conclude that the Carpenters presented sufficient evidence to sustain their breach of contract claims.[5] With respect to the sidewalk, both Charles and Christopher Nellis testified that the sidewalk was improperly graded, which led to water running back towards the house. Christopher also testified that the only way to fix this issue was to remove and replace the sidewalk. Because Master had installed this sidewalk three years earlier, the record supports the trial court's determination that Master was responsible for the grading issue[6] and, as a result, that Master breached the Agreement.

_____

[5] Master waived its claims regarding the Nellises' expert testimony. The trial court accepted Charles as an expert, see N.T. Trial at 54, and Master did not object to Christopher's testimony on the ground that it was unqualified expert testimony. Further, the record shows that the Nellises examined and repaired the work performed by Master. Both Charles and Christopher testified as to the issues with the property and the issues with the work as they saw it in September 2012. Therefore, even if Master had objected on the basis that Christopher provided expert testimony, the majority of his testimony was either factual or lay opinion on the condition of the property as Nellis encountered it and the work it performed to correct those issues.

In addition, it was not necessary for the Nellises to review the scope of the Agreement, a document that speaks for itself. Nor does the fact that the neither Nellis observed the property until September 2012 undermine the sufficiency of the evidence as to breach. At most, that fact goes to the weight of the evidence, not its sufficiency.

[6] The trial court asked Christopher about issues with concrete "settling":

_____

THE COURT: I am going to ask: Are there things that can happen to concrete that can change the grade after you've been there?

[CHRISTOPHER NELLIS]: Settling, sir.

THE COURT: How much have you seen in your experience -- how old are you?

[CHRISTOPHER NELLIS]: I'm 43.

THE COURT: You are such a kid. Okay. God bless you. But you've seen concrete drop; is that correct?

[CHRISTOPHER NELLIS]: I have, yes.

THE COURT: Anybody's fault?

[CHRISTOPHER NELLIS]: On occasion, yes, Your Honor. They weren't properly tied into the structure.

THE COURT: Any way of really knowing that?

[CHRISTOPHER NELLIS]: No.

THE COURT: Any way of really knowing if it is anybody's fault?

[CHRISTOPHER NELLIS]: No.

THE COURT: Could be the mix, could be the ground, right?

[CHRISTOPHER NELLIS]: Yes.

THE COURT: Could be where it is?

[CHRISTOPHER NELLIS]: Yes.

N.T. Trial at 93-94.

Master argues that the Carpenters failed to meet their burden of proof because this testimony "established that concrete can settle and move over a number of years for any number of reasons." Master's Br. at 31. This argument does not affect our sufficiency analysis. Although the trial court's line of questioning did reveal that concrete can "settle" or change level for reasons other than the fault of the installer, it did not "establish" that such

With respect to the downspouts, the evidence shows that McQuaide installed the downspouts, which were included in the proposal.[7] The Nellises' testimony supports the trial court's finding that these downspouts were improperly installed, causing water to flow toward the house. In short, the record supports the trial court's determination that Master did not install these in a workmanlike manner and, as a result, breached the Agreement.

With respect to the air conditioner, the record similarly supports the trial court's conclusion. Marie Carpenter testified that the air conditioner was left approximately one foot below grade level, causing water to run into the air conditioner unit. Master is correct that the Agreement does not specifically reference the air conditioner unit. However, the Carpenters' claim is that in building the addition, Master caused the air conditioner to be below grade level, which Eleanor Carpenter referred to as a common-sense issue. Although Master did not specifically agree to move the air conditioner, Master was responsible for building the addition in a workmanlike manner, which included properly addressing drainage issues. Accordingly, we conclude that

_____

faultless settling occurred here. The evidence before the trial court, although sparse, established: (1) Master installed the walkway in 2009; (2) by September 2012, the walkway was pitched towards the house; and (3) because of the pitch, Nellis had to remove and replace the sidewalk. The trial court's logical inference that this issue was caused by Master's workmanship, particularly in the absence of any contrary theory or evidence offered by Master, is supported by the record.

[7] In the "Roofing & Siding" section of the adopted Proposal, Master agreed to "Install Alcoa aluminum gutter and downspouts to addition roof and connect to storm drain." Proposal, 7/9/09, at 2.

the record supports the trial court's determination that Master breached the Agreement by failing to properly address the issues with the air conditioning unit when it built the addition.

Master's claim that the agreement's one-year warranty provision precludes the Carpenters from recovering is also without merit. In their complaint, rather than making a warranty claim, the Carpenters instead alleged that Master failed to perform the contract in a workmanlike manner. The warranty in the Agreement does not preclude a claim, filed within the applicable statute of limitations, for breach of a contractual obligation to perform in a workmanlike manner. Rather, the warranty only provides a guaranty that Master's work is "free from defects in workmanship" for a period of one year from the date of completion. Agreement at 1. Later in the same paragraph, the Agreement states that "[t]his guarantee is without prejudice to, and does not affect any rights that the homeowner may have under state law." Id.[8]

III.  Weight of the Evidence

Finally, Master argues the trial court's verdict was against the weight of the evidence. Specifically, Master asserts that the evidence (1) showed that the Carpenters failed to contact Master before allowing Nellis to proceed on the repairs, (2) failed to establish that the damages suffered were caused by

_____

[8] Although we agree with Master that the Carpenters were inconsistent when testifying about the timing of their contacts with McQuaide, given that they are not claiming a breach of warranty, they had no obligation to notify Master within one year of the completion of work.

- 22 -

Master's work, and (3) showed that the Carpenters did not give Master a chance to cure the issues. The trial court disagreed, concluding that its verdict was not against the weight of the evidence.

We have stated that:

> [a] weight of the evidence claim is addressed to the discretion of the trial judge. Armbruster v. Horowitz, . . . 813 A.2d 698, 702 ([Pa.] 2002). The authority of the trial judge to upset the verdict on weight grounds
>
>> is narrowly circumscribed. A trial judge cannot grant a new trial because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion. Instead, a new trial should be granted only in truly extraordinary circumstances, i.e., when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.
>
> Id. at 703 (emphasis in original; internal citations omitted).

Sutch v. Roxborough Mem'l Hosp., 151 A.3d 241, 250-51 (Pa.Super. 2016). Further, "a new trial will not be granted on the ground that the verdict was against the weight of the evidence where the evidence is conflicting and the fact-finder could have decided in favor of either party." Lanning v. West, 803 A.2d 753, 766 (Pa.Super. 2003).

The bulk of Master's argument addresses the trial court's assessment of the credibility of witnesses. It is well settled that "the credibility of witnesses is an issue to be determined by the trier of fact. . . ., [which] this Court will not revisit." Stephan, 100 A.3d at 667 (quoting Woods v. Cicierski, 937

A.2d 1103, 1105 (Pa.Super. 2007) (internal citations omitted)). "Thus, [an] argument, which would require this Court to revisit and essentially reverse the [trial court] on [its] credibility determinations, provides no grounds for relief." Id. (some alterations in original). We conclude that the trial court did not abuse its discretion.

Finally, to the extent that Master's weight claims are based on factors other than witness credibility, we conclude that they are likewise without merit. As discussed above, the evidence was sufficient to support the trial court's conclusions. While in some respects that evidence was not overwhelming, we nonetheless are not convinced that the verdict "shock[s] one's sense of justice" or that "a new trial is imperative so that right may be given another opportunity to prevail." Sutch, 151 A.3d at 251 (quoting Armbruster, 813 A.2d at 702).

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/28/2017

- 24 -