J-A18020-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAEVON DONTA PLOWDEN | : | |
| | : | |
| Appellant | : | No. 953 WDA 2018 |

Appeal from the Judgment of Sentence Entered March 16, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0007477-2016

BEFORE: BOWES, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED SEPTEMBER 06, 2019**

Appellant Daevon Donta Plowden appeals from the judgment of

sentence entered following his jury trial convictions for two counts of

aggravated assault and one count each of first-degree murder, attempted

homicide, and firearms not to be carried without a license.[1]    Appellant

challenges the trial court's denials of his motion *in limine*, request for a jury

instruction regarding evidence of habit, and request for funds to hire an expert

witness.  Appellant also challenges the sufficiency of the evidence supporting

the firearms conviction.  We affirm.

The relevant facts and procedural history of this appeal are as follows.

The events leading up to the May 25, 2016 murder of Tamar
Taylor, and the attempted murder of Daniel Jones, began several
months prior, when [Appellant] began dating a woman named

---

[1] 18 Pa.C.S. §§ 2702(a)(1), (4), 2502(a), 901(a), and 6106(a)(1),
respectively.

Lashawna Holmes in October of 2015. Ms. Holmes previously had been in a long-term and tumultuous relationship with Daniel Jones for approximately nine and a half (9½) years, and they had a daughter together in 2008. After her relationship with Mr. Jones ended, Ms. Holmes started seeing [Appellant]. Mr. Jones did not like [Appellant], and he threatened and intimidated [Appellant] multiple times over the course of Ms. Holmes' relationship with [Appellant]. Some of the threats were made through Ms. Holmes, such as when Mr. Jones told her that [Appellant's] "clock was ticking."

There were two (2) specific incidents preceding the night of the murder where Mr. Jones allegedly pulled a gun on [Appellant]. The first incident occurred in late October of 2015, when Mr. Jones followed [Appellant] and Ms. Holmes to the Marriott Hotel in the Waterfront area of Homestead, PA, where the couple was attempting to enjoy a weekend getaway.

\* \* \*

The second incident occurred a few months later, towards the end of 2015 or the beginning of 2016.

\* \* \*

On May 25, 2016, [Appellant] was at his Brentwood home, where he lived with Ms. Holmes, her daughter Skye, and Ms. Holmes' mother and father. The residence, located at 45 Bellanca Avenue, was three (3) stories high, had a small yard, brick porch, and a side door with a small porch on the right side of the house. At approximately 9:00 p.m. that evening, Skye texted her father, Mr. Jones, and asked if he could drop off a sleeping bag and bug spray that she needed for an upcoming camping trip. When Skye told her mother that she had texted her father, Ms. Holmes became upset. Ms. Holmes told Mr. Jones not to come over because he was not welcome at the house and that she would call the police if he came. Mr. Jones ignored her warnings and insisted that he was coming over. Ms. Holmes then told [Appellant] about Skye's text and that Mr. Jones was coming to the house. At the time of this conversation, [Appellant] was dressed casually in a white t-shirt and grey basketball shorts.

Ms. Holmes waited for Mr. Jones outside of the home on her front porch. Mr. Jones arrived at the house around 9:30 p.m.,

approximately 15 to 30 minutes after Skye texted him. His friend and co-worker, Tamar Taylor, had driven Mr. Jones to the house. Mr. Taylor waited inside of his car while Mr. Jones dropped off the camping supplies. Mr. Taylor's car was parked across the street from the home at 45 Bellanca Avenue, with the driver's side door facing the house. Mr. Taylor had left the car running while he waited for Mr. Jones.

When Mr. Jones exited the vehicle, Ms. Holmes was angry, and she asked why he had come over when she had told him that he was not welcome. She told him that he should not be there and that she would call the police. Mr. Jones did not verbally respond to her; rather, he made a peace sign and walked towards Sheila Taylor, Ms. Holmes' mother, who was waiting for him to receive the supplies. Mr. Jones, walking across the street from the car toward the house, approached the curb, handed the camping supplies to Mrs. Taylor, said thank you, and turned, walking back to the car. The entire encounter lasted no more than one minute, and Mr. Jones never stepped foot on the curb, sidewalk, yard, or porch of the residence. Mrs. Taylor immediately returned to the home after receiving the supplies from Mr. Jones.

Mr. Jones was entering the vehicle, and his body was halfway inside, when [Appellant] appeared from the side of the house with a gun in his hand. [Appellant] had changed clothes and was now dressed in a black t-shirt, black pants, and black hat. He asked Mr. Jones why he was outside of the house, and he told Mr. Jones that he should not be there. Mr. Jones replied, "You done? You done?" Ms. Holmes went into the house to call 911 because she feared that the confrontation would escalate.

After appearing from the side of the house, dressed in all black, and telling Mr. Jones that he should not be there, [Appellant] began firing his weapon at Mr. Jones and the vehicle that he was partially occupying. When the shots began, Mr. Jones exited the car and took cover behind the rear passenger side door. He began running when he heard a pause in the gunfire. [Appellant] chased Mr. Jones down the middle of the street while firing his gun at him, and he shot Mr. Jones in the left buttocks as Mr. Jones was running away. Mr. Jones was able to escape without any fatal injuries despite the fact that [Appellant] had fired an entire clip of ammunition and had even reloaded his weapon.

\*   \*   \*

- 3 -

Ms. Holmes and her mother heard gunshots from inside of the house. Mrs. Taylor recalled approximately two (2) minutes passing from the time that she took the sleeping bag from Mr. Jones to the time that she heard the gunshots. Ms. Holmes heard "a ton of gunshots" then heard a "slight pause," followed by more gunshots. After the gunfire ceased, Ms. Holmes came outside and saw [Appellant] "in the distance down the street" on the far side of 55 Bellanca Avenue. She did not see Mr. Jones. Ms. Holmes did, however, see Tamar Taylor's car collide with another vehicle in front of 53 Bellanca Avenue. The car crash was the result of Mr. Taylor being struck and killed by four (4) bullets that had been intended for [Mr.] Jones. Mr. Taylor's car was still running when the police arrived on scene.

[Appellant] fled from the scene of the shooting and was apprehended an hour later, at approximately 10:12 p.m. [Appellant] was discovered by Pittsburgh Police Officer Lucas Coyne and his K-9 partner, Dash. [Appellant] was found hiding near a tree in the backyard area between 69 and 63 Bellanca Avenue. The area was a "wooded hillside" with "waist high" shrubbery and grass. [Appellant's] black "Carhartt winter tossle cap" was discovered approximately 20-30 feet away from where [Appellant] was hiding. [Appellant] did not have any injuries.

[Appellant's] first statement upon being located was "okay, okay, you got me." Immediately following his capture, [Appellant] lied to [Brentwood Police] Officer [Carl] Rech twice about the presence and location of his firearm. [Appellant] first told Officer Rech that he did not have a firearm at all. [Appellant] later admitted that he had a firearm, but then lied about its whereabouts. He told Officer Rech that he had thrown it on a rooftop. "[T]here was [an] active search all night for guns up Bellanca Avenue and in between Farson Way and Bellanca." . . . [Appellant's] black Glock 9 millimeter firearm was ultimately found approximately 15-30 feet away from where he had been apprehended. The firearm was found "on the ground [] under the [thick] shrubbery, brush." The firearm was partially concealed by the foliage, which made it difficult to see.

* * *

During his interview [with the police], and at trial, [Appellant] claimed that he was acting in self-defense. He said that Daniel

- 4 -

Jones had pointed a gun at him over the roof of the car that night. He stated that he did not give Mr. Jones a chance to shoot, instead pulling a Glock 9 firearm from his waistband and shooting. However, Ms. Holmes testified that she never saw Mr. Jones with a firearm that night, and Mr. Jones testified that he did not have a firearm on night of the incident. Law enforcement also did not find a weapon on Mr. Jones when they were clearing him for medical transport. Further, investigators did not find any other weapons after searching the crime scene that night.

Trial Ct. Op., 10/2/18, at 4-13 (record citations and emphasis omitted).

On July 17, 2017, Appellant filed an omnibus pretrial motion that included a request for funds to hire a "forensic psychologist who can explain [Appellant's] actions after the shooting. That is, were [Appellant's] actions an involuntary response following a traumatic event?" Omnibus Pretrial Mot., 7/17/17, at 8 (quotation marks omitted). Appellant also filed a motion *in limine*, arguing that "[t]he jury must be apprised of the numerous [protection from abuse (PFA)] filings documenting [Mr.] Jones's possession and use of a firearm and his convictions for the same." *Id.* at 11 (footnote omitted).

The trial court conducted hearings on July 19, 2017, and September 14, 2017. On September 22, 2017, the trial court denied the motion *in limine* and the request for funds to hire a forensic psychologist.[2] Regarding the motion *in limine*, the trial court noted that Appellant failed to establish his knowledge of the PFA filings at the time of the shooting. Appellant's "failure to lay a proper foundation as to knowledge is fatal to [Appellant's] motion, because evidence of the . . . PFA filings only would be relevant to buttress [Appellant's]

_____

[2] Appellant's omnibus pretrial motion included a separate request for funds to retain a private investigator, which the trial court granted.

- 5 -

self-defense claim that he reasonably believed his life was in danger . . . ." Order, 9/22/17, at ¶ 6.

Appellant subsequently filed a reconsideration motion, asserting that he was aware of the PFA filings at the time of the shooting. Appellant cited the transcript of his interview with the police, where he told a detective about a PFA order Ms. Holmes had obtained against Mr. Jones. For the first time, Appellant also provided three PFA petitions that Ms. Holmes had filed against Mr. Jones. Two of the petitions described the incidents where Mr. Jones confronted Appellant with a firearm. *See* Mot. for Recons., 11/9/17, at Exs. C, G. Nevertheless, the trial court denied Appellant's reconsideration motion on November 15, 2017.

On December 8, 2017, Appellant filed a supplemental motion for reconsideration, reiterating that he had "demonstrated his firsthand knowledge of [the] PFA [filings], and these facts **must** be presented to the jury so they have a complete and accurate picture of the context in which this shooting occurred." Mot., 12/8/17, at 2 (emphasis in original). The parties appeared for trial on December 12, 2017. Before the jury entered the courtroom, the trial court heard additional arguments regarding the admissibility of evidence about the PFA filings.

Ultimately, the trial court continued to deny Appellant's motion *in limine*. The trial court explained:

> THE COURT: Given the PFAs are with [Ms. Holmes] and do not have mention of [Appellant], PFAs are out. If [Ms. Holmes] has

knowledge of incidents where the guns were pulled on [Appellant] that's fine, those incidents can come in.

[Appellant's Counsel]: With the issue of—I suspect it's going to come up: [Mr. Jones], you weren't supposed to be here. Why are you here? I don't know what Ms. Holmes is going to say when she gets up there to testify, I think the jury is going to be scratching their head, well, what's everybody talking about? My purpose—

THE COURT: That kind of stuff is always in the courtroom, there is always stuff that is not mentioned, and we always get around it with witnesses. So we're not adding the PFA to explain why he couldn't be around her. It simply isn't going to come in for that purpose, okay.

N.T. Trial, 12/12-15/17, at 14-15.

Prior to the conclusion of trial, Appellant requested a special jury instruction pursuant to Pa.R.E. 406. The instruction would inform the jury that evidence of a person's habit or routine may be considered to prove that the person acted in accordance with the habit on a particular occasion. Appellant sought this instruction in light of his theory that Mr. Jones had a regular habit of carrying a firearm. The trial court denied Appellant's request for the instruction, noting that the two incidents where Mr. Jones pulled a gun on Appellant prior to the shooting did not amount to a habit. *See id.* at 593.

Following trial, the jury convicted Appellant of the aforementioned offenses. On March 16, 2018, the trial court sentenced Appellant to life imprisonment for the first-degree murder conviction, plus a concurrent term of twenty to forty years' imprisonment for the attempted homicide conviction. The trial court imposed a consecutive term of two to four years' imprisonment

for the firearms conviction and no further penalty for the aggravated assault convictions.

Appellant timely filed a post-sentence motion on March 26, 2018, which included a request to file supplemental post-sentence motions after he obtained all relevant transcripts. The trial court permitted Appellant to file supplemental post-sentence motions no later than June 1, 2018. Appellant timely filed his supplemental post-sentence motions on May 18, 2018. Appellant raised challenges to the weight and sufficiency of the evidence, as well as the trial court's rulings on the motion *in limine*, the requested jury instruction, and the hiring of an expert witness. The trial court denied Appellant's post-sentence motions on June 21, 2018.

Appellant timely filed a notice of appeal on July 2, 2018, and a court-ordered Pa.R.A.P. 1925(b) statement on July 20, 2018. The trial court filed a responsive opinion concluding that (1) evidence of the PFA filings did not make it more likely that Appellant was justified in his use of deadly force; (2) Ms. Holmes' testimony did not support a jury instruction on habit; (3) whether Appellant reasonably feared for his life immediately following the shooting was not beyond the knowledge of the jury and did not require an expert explanation; and (4) sufficient evidence supported Appellant's firearms conviction where police found the gun concealed under the tall grass where Appellant had been hiding from the police.

Appellant now raises four questions for our review:

I. Did the trial court err in denying [Appellant's] motion *in limine* to introduce the PFAs filed by Ms. Holmes against Mr. Jones by finding that [Appellant] had failed to show knowledge of the PFAs when [Appellant] had presented evidence that he knew of the PFAs?

II. Did the trial court err by denying [Appellant's] proposed jury instruction regarding Pa.R.E. 406 (Habit; Routine Practice) where there was testimony presented that Mr. Jones always carried a gun with him?

III. Did the trial court abuse its discretion when it denied [Appellant], an indigent client with court appointed counsel, additional funds for a forensic psychologist to examine [Appellant] and establish that he held an honest, bona fide belief that he was in danger?

IV. Whether the evidence was insufficient to support [Appellant's] conviction for Carrying a Firearm Without a License where the Commonwealth failed to prove the essential element of concealment?

Appellant's Brief at 7.

In his first issue, Appellant claims that the trial court erred in denying his motion *in limine* to admit evidence the PFAs against Mr. Jones. *Id.* at 24. Appellant argues that he attempted to advance a self-defense claim at trial. *Id.* Appellant asserts that "[e]vidence of the PFAs would have informed the jury that Mr. Jones always carried—and, importantly, always brandished—a firearm when interacting with [Appellant] and Ms. Holmes." *Id.* at 25. Appellant contends that "[s]uch evidence would have corroborated [Appellant's] statement that Mr. Jones was pulling a firearm out to shoot [Appellant] on the night of Mr. Taylor's death, that [Appellant] was reasonable in his belief of seeing Mr. Jones with a firearm, and that was why [Appellant] responded by firing his own firearm." *Id.* Regarding the trial court's

determination that Appellant failed to establish his knowledge of the PFAs at the time of the shooting, Appellant insists "not only did he know about the PFAs . . . against Mr. Jones, he was present for at least two of the incidents that gave rise to the PFAs." ***Id.*** at 27. Appellant concludes that the court abused its discretion in denying his motion *in limine*. ***Id.*** at 31.

This Court's standard of review for issues regarding the admissibility of evidence is well settled:

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court . . . [and] we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. [I]f in reaching a conclusion the trial court over-rides [sic] or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

***Commonwealth v. Belknap***, 105 A.3d 7, 9-10 (Pa. Super. 2014) (alterations in original and citations and quotation marks omitted); ***see also Commonwealth v. Moser***, 999 A.2d 602, 605 (Pa. Super. 2010) (explaining that this Court applies an evidentiary abuse of discretion standard of review when ruling on a trial court's decision to grant or deny a motion *in limine*).

"Relevance is the threshold for admissibility of evidence." ***Commonwealth v. Tyson***, 119 A.3d 353, 358 (Pa. Super. 2015) (*en banc*) (citation omitted).

> Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable,

- 10 -

or tends to support a reasonable inference or proposition regarding a material fact. Relevant evidence may nevertheless be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Commonwealth v. Danzey*, 210 A.3d 333, 342 (Pa. Super. 2019) (citation and quotation marks omitted).

A claim of self-defense requires evidence establishing three elements:

(a) that the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the defendant did not violate any duty to retreat. Although the defendant has no burden to prove self-defense, . . . before the defense is properly in issue, there must be some evidence, from whatever source, to justify such a finding.

*Commonwealth v. Mouzon*, 53 A.3d 738, 740 (Pa. 2012) (citations, quotation marks, footnote, and brackets omitted).

[O]ur [S]upreme [C]ourt has held that in a homicide trial, where self-defense is asserted, the defendant may introduce evidence of the turbulent or dangerous character of the decedent. This type of character evidence is admissible on either of two grounds: 1) to corroborate the defendant's alleged knowledge of the victim's violent character in an effort to show that the defendant reasonably believed that [his] life was in danger; and/or 2) to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor.

*Commonwealth v. Carbone*, 707 A.2d 1145, 1154 (Pa. Super. 1998) (citations and emphasis omitted); *see also Commonwealth v. Darby*, 373 A.2d 1073, 1074-75 (Pa. 1977) (holding that a defendant claiming self-defense should have been allowed to testify that he knew the victim had been

- 11 -

arrested previously for violent crimes, and the victim's arrest record should have been admitted to corroborate the defendant's testimony that he believed his life was in danger, even if no convictions resulted from the victim's arrests).

Additionally, not all evidentiary errors entitle an appellant to relief:

Harmless error exists if the state proves either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Fulton*, 179 A.3d 475, 493 (Pa. 2018) (citations omitted).

Instantly, the trial court determined that Appellant is not entitled to relief on his claim regarding the evidence of the PFA filings:

Contrary to [Appellant's] assertion, the fact that Daniel Jones was legally prohibited from coming into contact with Lashawna Holmes did not make it more likely that [Appellant] was justified in his use of deadly force on the night of the shooting. Even if [Appellant] was aware of the fact that a PFA Order was in place, he was not automatically entitled to use deadly force against a person who might violate a court order. The evidence did not show that Mr. Jones was acting in a violent manner towards Ms. Holmes and that [Appellant] was coming to her defense. While it is true that Ms. Holmes did not want Mr. Jones at her residence that evening, their interaction was incredibly brief, with no verbal response by Mr. Jones to Ms. Holmes' questions—only the flashing of a peace sign. Mr. Jones provided the camping supplies to Ms. Holmes' mother. Mr. Jones was attempting to leave when [Appellant] initiated the confrontation with a loaded gun, in fact, in his hand.

\* \* \*

> In any event, even if this court abused its discretion in precluding reference to the PFA Order at trial, which it submits that it did not, any error in precluding the reference was harmless because the court permitted the jury to hear evidence of the underlying facts which gave rise to the PFA Order. Allowing the jury to hear evidence of that specific instance of conduct was more than sufficient to establish [Appellant's] awareness that Daniel Jones carried a firearm. The jury also heard evidence that Daniel Jones had made threats against [Appellant], . . . and that Daniel Jones was not welcome at the residence. Accordingly, because the jury still heard the substantive facts which triggered the issuance of the PFA Order, the jury was able to assess whether [Appellant's] fear of Daniel Jones was sincerely held and objectively reasonable under the circumstances.

Trial Ct. Op. at 26-27 (record citations omitted).

Here, the Commonwealth presented evidence regarding the incidents that served as the foundation for the two PFA petitions related to Mr. Jones. *See* N.T. Trial at 148-56. Ms. Holmes' trial testimony established that on two occasions, Mr. Jones brandished a firearm during a confrontation with Appellant. On this record, Appellant failed to establish that the exclusion of additional evidence regarding the formalities of the PFA filings significantly contributed to the verdict. *See Fulton*, 179 A.3d at 493.

In his second issue, Appellant argues that his cross-examination of Ms. Holmes established that "Mr. Jones had a habit of routinely and constantly carrying a firearm." Appellant's Brief at 33. Appellant maintains that because the jury received evidence regarding Mr. Jones' habit of carrying a firearm, the trial court needed to provide a jury instruction about habit evidence. *Id.* at 44. Appellant concludes that the trial court abused its discretion by denying his request for a jury instruction on habit evidence. *Id.*

- 13 -

"Our standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." **Commonwealth v. Cannavo**, 199 A.3d 1282, 1286 (Pa. Super. 2018) (citation and brackets omitted).

> In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision. It has long been the rule in this Commonwealth that a trial court should not instruct the jury on legal principles which have no application to the facts presented at trial.

**Commonwealth v. Buterbaugh**, 91 A.3d 1247, 1257 (Pa. Super. 2014) (*en banc*) (citations, quotation marks, and brackets omitted).

"Evidence of a person's habit . . . may be admitted to prove that on a particular occasion the person . . . acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or there was an eyewitness." Pa.R.E. 406. "For evidence of habit to be admissible, the habit must have occurred with sufficient regularity to make it probable that it would be carried out in every instance or in most instances." **Commonwealth v. Harris**, 852 A.2d 1168, 1178 (Pa. 2004) (citation omitted); **see also Commonwealth v. Sanchez**, 848 A.2d 977, 984 (Pa. Super. 2004) (holding that two forged checks were not admissible as habit evidence at a trial for insurance fraud; two instances of forgery did not rise to a level of continuous and systematic conduct under Rule 406; moreover, "habit evidence is frequently conduct involving mundane matters").

Instantly, the trial court determined that the two instances when Mr. Jones brandished a firearm in Appellant's presence did not amount to "'nonvolitional activity' that occurred with 'invariable regularity.'" Trial Ct. Op. at 34 (citing **Sutch v. Roxborough Mem'l Hosp.**, 151 A.3d 241, 253 (Pa. Super. 2016)). We agree with the trial court that Appellant failed to establish that the two occasions described in Ms. Holmes' testimony constituted a habit that "occurred with sufficient regularity to make it probable that it would be carried out in every instance or in most instances." **See Harris**, 852 A.2d at 1178. Because Rule 406 did not apply to the facts presented at trial, the trial court properly denied Appellant's requested jury instruction. **See Buterbaugh**, 91 A.3d at 1257; **Cannavo**, 199 A.3d at 1286.

In his third issue, Appellant contends "[t]he pivotal issue at [his] trial was whether or not he reasonably believed that Mr. Jones had a gun, and therefore, his life was in danger." Appellant's Brief at 47. Appellant insists that an expert in the field of forensic psychology could have confirmed that Appellant "held an honest, bona fide fear for his life" at the time of the shooting. **Id.** Further, an expert could have explained to the jury that Appellant's flight after the shooting was caused by something other than consciousness of guilt. **Id.** at 49. Appellant argues that he "was an indigent defendant, and the trial court denied him even the mere opportunity to seek out such an expert." **Id.** at 50. Appellant concludes that the trial court abused its discretion by denying his request for funds to secure an expert. **Id.** at 46.

The following standard applies to this Court's review of the denial of an indigent defendant's request for funds to obtain an expert:

> It is well-established that indigent defendants have a right to access the same resources as non-indigent defendants in criminal proceedings. The state has an affirmative duty to furnish indigent defendants the same protections accorded those financially able to obtain them. Procedural due process guarantees that a defendant has the right to present competent evidence in his defense, and the state must ensure that an indigent defendant has fair opportunity to present his defense.
>
> However, [t]he provision of public funds to hire experts to assist in the defense against criminal charges is a decision vested in the sound discretion of the court and a denial thereof will not be reversed absent an abuse of that discretion.

*Commonwealth v. Melvin*, 172 A.3d 14, 22-23 (Pa. Super. 2017) (citation omitted), *appeal denied*, 187 A.3d 207 (Pa. 2018).

"One way in which fact finders may be assisted in making more accurate and just determinations regarding guilt or innocence at trial is through the admission of expert testimony." *Commonwealth v. Walker*, 92 A.3d 766, 780 (Pa. 2014).

> Rule 702 of the Pennsylvania Rules of Evidence speaks to the general admissibility of expert testimony where scientific evidence is at issue, and provides that a witness who is qualified as an expert may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by a layperson; (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and (c) the expert's methodology is generally accepted in the relevant field. Thus, to be admissible, the expert testimony must be beyond the knowledge possessed by a layperson and assist the trier of fact to understand the evidence or determine a fact in issue.

*Id.* (quotation marks omitted). "[E]xpert testimony is not admissible where the issue involves a matter of common knowledge." ***Commonwealth v. Smith***, 206 A.3d 551, 560 (Pa. Super. 2019) (citation omitted).

Instantly, the trial court determined that the issue of whether Appellant was in reasonable fear for his life at the time of the shootings was "not beyond the knowledge and understanding of a lay person." Trial Ct. Op. at 35. We agree with the trial court that Appellant failed to establish a need for an expert on a matter of common knowledge: the reasonableness of Appellant's fear under the circumstances at issue. ***See Smith***, 206 A.3d at 560; ***see also Commonwealth v. King***, 721 A.2d 763, 781 (Pa. 1998) (explaining that there "was no need for an expert to testify to the fear that [the victim] felt in his confrontation with [the defendants]—the fact that a human being would experience fear [during a violent episode] is so basic that expert opinion is unnecessary to assist the jury"). Therefore, the trial court did not abuse its discretion in denying Appellant's request for funds to hire an expert. ***See Melvin***, 172 A.3d at 22-23.

In his fourth issue, Appellant claims that the evidence was insufficient to convict him of carrying a concealed firearm without a license. Appellant's Brief at 51. Appellant argues that concealment is an essential element of the offense of carrying a firearm without a license, and "the Commonwealth presented no evidence that [he] concealed the firearm on or about his person." *Id.* Appellant contends that "Mr. Jones and Ms. Holmes both indicated that [Appellant] was open[ly] brandishing the firearm the entire

time." *Id.* at 53. Appellant emphasizes that he "came from the side of the house with the unconcealed gun in hand; he did not suddenly pull the firearm out of his waistband, pocket, or jacket." *Id.* Following the shooting, Appellant maintains that he informed the police where to find the firearm, "and the police did, in fact, find the firearm plain[ly] resting on top of the grass in that location." *Id.* Absent some evidence of concealment, Appellant concludes that the Commonwealth presented insufficient evidence to support the conviction for carrying a firearm without a license. *Id.*

Our standard of review for sufficiency claims is as follows:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Tucker*, 143 A.3d 955, 964 (Pa. Super. 2016) (citation and brackets omitted).

Section 6106 of the Crimes Code provides, in pertinent part, that "any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree."   18 Pa.C.S. § 6106(a)(1).   "[T]o establish a violation of section 6106, the Commonwealth must establish that a defendant acted intentionally, knowingly or recklessly with respect to each element[.]"   *Commonwealth v. Johnson*, 192 A.3d 1149, 1155 (Pa. Super. 2018) (citation omitted), *appeal denied*, 200 A.3d 440 (Pa. 2019).

"[T]he issue of concealment depends upon the particular circumstances present in each case, and is a question for the trier of fact."   *Commonwealth v. Horshaw*, 346 A.2d 340, 343 (Pa. Super. 1975) (citation omitted) (analyzing prior version of Section 6106 that also contained the element of carrying a firearm "concealed on or about his person").   "[A]ny concealment, even partial, is sufficient to satisfy the concealment element of the crime."   *Commonwealth v. Montgomery*, 192 A.3d 1198, 1201 (Pa. Super. 2018) (citation and emphasis omitted).

Instantly, the trial court analyzed the unambiguous language of Section 6106(a), concluding that the Commonwealth established the concealment of Appellant's firearm:

> Carrying a weapon "about" one's person logically encompasses areas within one's reach, where a concealed weapon may be procured and used against an unsuspecting individual.   The evidence presented at trial demonstrated that [Appellant's] black Glock 9mm pistol was found at least partially concealed "under

- 19 -

the shrubbery brush," in the matted-down area of "thick," "waist-high" grass, "right in the same general area" where [Appellant] had been hiding. The firearm was found approximately 15-30 feet away from [Appellant], well within his reach.

Trial Ct. Op. at 23-24 (record citations omitted). Contrary to Appellant's argument that the police found the firearm resting on top of the grass, the Commonwealth submitted photographs of the location where the police recovered the firearm. The photographs confirm that the firearm was partially concealed by tall grass and plants. *See* Commonwealth's Trial Exs. 65-67.

In addition to the circumstantial evidence demonstrating that Appellant concealed the firearm in the thick grass where he was hiding, Appellant told the police that he pulled the firearm from his waistband while Mr. Jones stood near the vehicle. *See* Commonwealth's Trial Ex. 75 at 15. This admission alone was sufficient to demonstrate concealment. *See Montgomery*, 192 A.3d at 1201; *Horshaw*, 346 A.2d at 343; *see also Commonwealth v. Scott*, 436 A.2d 607, 608-09 (Pa. 1981) (holding that sufficient evidence supported the jury's conclusion that the defendant concealed a weapon where two witnesses testified that the defendant pulled something that looked like a gun from his waistband). Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, sufficient evidence supported Appellant's conviction for carrying a firearm without a license. *See* 18 Pa.C.S. § 6106(a)(1); *Tucker*, 143 A.3d at 964. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  9/6/2019